## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MADISON WEAVER, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.   2:23-CV-869 |
| | : | |
| v. | : | |
| | : | |
| GAT AIRLINE GROUND SUPPORT, | : | PLAINTIFF DEMANDS A TRIAL BY |
| INC.; CHRISTINA GAYLE; HOLLY | : | JURY |
| FOLLOWELL; WILMA BEATY; | : | |
| SALLY GARZO; KIRSTEN PORTER; | : | |
| KAWANA BACON; and TERRANCE | : | |
| COOGAN | : | |
| | : | |
| Defendants. | : | |

Plaintiff, MADISON WEAVER, by and through undersigned counsel, hereby files this Civil Action Complaint against Defendants GAT AIRLINE GROUND SUPPORT, INC., CHRISTINA GAYLE, HOLLLY FOLLOWELL, WILMA BEATY, SALLY GARZO, KIRSTEN PORTER, KAWANA BACON and TERRANCE COOGAN (collectively "Defendants") and avers the following:

## **PARTIES**

1. PLAINTIFF MADISON WEAVER (hereinafter also referred to as "PLAINTIFF") is a female individual who is a resident of the Commonwealth of Pennsylvania.

2. At all times material, GAT AIRLINE GROUND SUPPORT, INC. (hereinafter referred to as "DEFENDANT GAT") operates its headquarters at 246 City Circle, Suite 2200, Peachtree City, GA 30269.

3. At all times material, DEFENDANT GAT operates a principal place of business located in the Pittsburgh International Airport with an address of 1000 Airport Blvd., Pittsburgh, PA 15231.

1

4. At all times material, Defendant CHRISTINA GAYLE (hereinafter referred to as "Defendant GAYLE") was and is employed for Defendant GAT as a Manager.

5. At all times material, Defendant CHRISTINA GAYLE identified as female.

6. At all times material, Defendant GAYLE held supervisory authority over PLAINTIFF.

7. At all times material, Defendant HOLLY FOLLOWELL (hereinafter referred to as "Defendant FOLLOWELL") was and is employed for Defendant GAT as a Supervisor.

8. At all times material, Defendant FOLLOWELL identified as female.

9. At all times material, Defendant FOLLOWELL held supervisory authority over PLAINTIFF.

10. At all times material, Defendant WILMA BEATY (hereinafter referred to as "Defendant BEATY") was and is employed for Defendant GAT as Human Resources.

11. At all times material, Defendant BEATY identified as female.

12. At all times material, Defendant BEATY held supervisory authority over PLAINTIFF.

13. At all times material, Defendant SALLY GARZO (hereinafter referred to as "Defendant GARZO") was and is employed for Defendant GAT as Human Resources.

14. At all times material, Defendant GARZO identified as female.

15. At all times material, Defendant GARZO held supervisory authority over PLAINTIFF.

16. At all times material, Defendant KIRSTEN PORTER (hereinafter referred to as "Defendant PORTER") was and is employed for Defendant GAT as a Supervisor.

17. At all times material, Defendant PORTER identified as female.

18. At all times material, Defendant PORTER held supervisory authority over PLAINTIFF.

19. At all times material, Defendant TERRANCE COOGAN (hereinafter referred to as "Defendant COOGAN") was and is employed for DEFENDANT GAT as Regional Director PIT.

2

20. At all times material, Defendant COOGAN identified as a male.

21. At all times material, Defendant COOGAN held supervisory authority over PLAINTIFF.

22. At all times material, Defendant KAWANA BACON (hereinafter referred to as "Defendant BACON") was an is employed for Defendant GAT as Human Resources.

23. At all times material, Defendant BACON identified as female.

24. At all times material, Defendant BACON held supervisory authority over PLAINTIFF.

25. At all times material, Defendants were the joint and/or sole employer of PLAINTIFF.

## NATURE OF THE CASE

26. PLAINTIFF complains pursuant to 1964 Civil Rights Act ("Title VII"), violations of the Pregnancy Discrimination Act of 1978 ("PDA"), §§701 *et. seq* (42 U.S.C. §2000e(k)), violations of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951 *et. seq.*, violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, and violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12102 *et. seq.,* and seeks damages to redress the injuries PLAINTIFF has suffered as a result of being subjected to discrimination, retaliation, and wrongful termination by the aforementioned Defendants.

27. Furthermore, this action is to redress the Defendants' unlawful employment practices against PLAINTIFF, including Defendants' unlawful discrimination against PLAINTIFF because of her sex/pregnancy and/or disability and for Defendants wrongful actions against PLAINTIFF leading up to, and including, her unlawful termination.

28. PLAINTIFF seeks declaratory and injunctive relief, actual damages, compensatory damages, punitive damages, reinstatement, attorneys' fees, litigation costs, and pre- and post-judgment interest as remedies for Defendants' violations of her rights.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

30. This Court has jurisdiction in that this action involves a Federal Question under Title VII of the Civil Rights Act of 1964.

31. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

32. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statue, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

33. Venue is proper in the Western District of Pennsylvania based upon Defendants' residency and that a substantial part of the events or omissions giving rise to the claims occurred within Allegheny County in the Commonwealth of Pennsylvania in the Western District of Pennsylvania. 28 U.S.C. § 1391(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

34. Around July 18, 2022, PLAINTIFF filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants as set forth herein.

35. Around August 19, 2022, Plaintiff filed a supplemental Charge of Discrimination with the EEOC against Defendants as set forth herein.

36. PLAINTIFF's Charges of Discrimination were dual filed with the Pennsylvania Human Resources Commission ("PHRC").

37. Around February 28, 2023, the EEOC sent a Dismissal and Notice of Rights to PLAINTIFF by electronic mail.

38. This action is hereby commenced within ninety (90) days of receipt of the Dismissal and Notice of Rights.

39. PLAINTIFF has complied with all administrative prerequisites to bring this lawsuit.

40. PLAINTIFF's PHRA claims are still pending because less than one year has elapsed since Plaintiff filed with the PHRC.

41. PLAINTIFF will seek to amend her complaint to assert the newly ripened causes of action under the PHRA against the parties referenced above. See Fed. R. Civ. P. 15(a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiffs may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.").

## MATERIAL FACTS

42. Around August 2021, PLAINTIFF became pregnant.

43. Around September 2021, Defendant GAT hired PLAINTIFF as a Customer Service Agent.

44. Around October 2021, PLAINTIFF informed Defendants GAYLE and FOLLOWELL she was pregnant.

45. Around March 24, 2022, PLAINTIFF asked Defendant GAYLE for leave.

46. PLAINTIFF began her maternity leave around March 24, 2022.

47. PLAINTIFF returned from maternity leave on May 26, 2022.

48. Upon returning from maternity leave, PLAINTIFF was subjected to pervasive discrimination and harassment due to her sex and/or disability by Defendants GAYLE, BEATY, GARZO, and PORTER.

49. Upon returning to work, PLAINTIFF's work hours were 3:00 p.m. to 10:00 p.m. two days per week.

50. When she returned from maternity leave, PLAINTIFF told Defendants GAYLE and FOLLOWELL of her need to breast pump every three (3) hours.

51. However, Defendants GAYLE, FOLLOWELL, and PORTER refused to permit PLAINTIFF to take the necessary breaks needed for her to express milk.

52. Specifically, when PLAINTIFF would ask Defendants GAYLE, FOLLOWELL, and PORTER if she could take breaks to pump, Defendants GAYLE, FOLLOWELL, and PORTER would refuse to accommodate PLAINTIFF and force PLAINTIFF to wait until the scheduled breaks.

53. As a result, PLAINTIFF had to forego her lactation specialist-recommended pump schedule and breast pump when she could, which was oftentimes well beyond the recommended three-hour window.

54. By way of example, and by no means an exhaustive list, on May 26, 2022, prior to beginning her shift, PLAINTIFF pumped around 3:05 p.m.

55. PLAINTIFF was not allowed to pump until 6:39 p.m., three (3) hours and thirty-four (34) minutes after her previous pumping session.

56. PLAINTIFF returned from her pumping break and was not permitted to pump again until 10:25 p.m., approximately three (3) hours and forty-six (46) minutes after her previous pumping session.

57. By way of further example, and by no means an exhaustive list, on June 6, 2022, prior to beginning her shift, PLAINTIFF pumped around 3:43 p.m.

58. PLAINTIFF was not allowed to pump until 6:56 p.m., three (3) hours and thirteen (13) minutes after her previous pumping session.

59. By way of further example, and by no means an exhaustive list, on June 9, 2022, prior to beginning her shift, PLAINTIFF pumped around 2:58 p.m.

60. PLAINTIFF was not allowed to pump until 6:16 p.m., three (3) hours and eighteen (18) minutes after her previous pumping session.

61. By way of further example, and by no means an exhaustive list, on June 12, 2022, prior to beginning her shift, PLAINTIFF pumped around 1:15 p.m.

62. PLAINTIFF was not allowed to pump until 4:40 p.m., three (3) hours and twenty-five (25) minutes after her previous pumping session.

63. By way of further example, and by no means an exhaustive list, on June 16, 2022, prior to beginning her shift, PLAINTIFF pumped around 2:28 p.m.

64. PLAINTIFF was not allowed to pump until 5:50 p.m., three (3) hours and twenty-two (22) minutes after her previous pumping session.

65. PLAINTIFF was then forced to pump at 6:50 p.m. despite not needing to pump.

66. PLAINTIFF was not allowed to pump until 10:17 p.m., three (3) hours and twenty-seven (27) minutes after her previous pumping session.

67. By way of further example, and by no means an exhaustive list, on June 17, 2022, prior to beginning her shift, PLAINTIFF pumped around 2:35 p.m.

68. PLAINTIFF was not allowed to pump until 6:10 p.m., three (3) hours and thirty-five (35) after her last pumping session.

69. By way of further example, and by no means an exhaustive list, on June 23, 2022, prior to beginning her shift, PLAINTIFF pumped around 2:25 p.m.

70. PLAINTIFF was not allowed to pump until 5:48 p.m., three (3) hours and twenty-three (23) minutes after her previous pumping session.

71. PLAINTIFF was then forced to pump at 6:51 p.m. during her break despite not needing to pump.

72. PLAINTIFF was not allowed to pump until around 10:30 p.m., approximately three (3) hours and thirty-nine (39) minutes after her last pumping session.

73. By way of further example, and by no means an exhaustive list, on June 24, 2022, prior to beginning her shift, PLAINTIFF pumped around 2:25 p.m.

74. PLAINTIFF was not allowed to pump until 6:02 p.m., three (3) hours and thirty-seven (37) minutes after her previous pumping session.

75. Due to Defendant GAT's failure to provide PLAINTIFF with reasonable breaks to pump, PLAINTIFF suffered from a clogged duct on at least one occasion.

76. Specifically, in a text exchange between PLAINTIFF and Defendant GAYLE, PLAINTIFF told Defendant GAYLE, "**I also have a clogged duct now so pumping when I need to is just really important.**"

77. Upon information and belief, Defendants perceived PLAINTIFF as having a disability related to her need to express breast milk.

78. Due to Defendant GAT's failure to provide PLAINTIFF with reasonable breaks to pump, PLAINTIFF suffered from pain and discomfort related to the delay in expressing her breast milk.

79. On June 24, 2022, PLAINTIFF met with Defendants GAYLE and FOLLWELL to address her concerns regarding Defendant GAT's failure to follow PLAINTIFF's pumping schedule.

80. During the meeting, Defendant GAYLE informed PLAINTIFF that "pumping during operations was no longer an option."

81. However, on May 27, 2022 and June 3, 2022, PLAINTIFF was permitted to pump during operations without issue.

82. In an effort to not have to accommodate PLAINTIFF, Defendant GAYLE told PLAINTIFF that she should consider taking leave until she was done breastfeeding.

83. Defendant GAYLE also told PLAINTIFF that she could no longer pump in the land-side office.

84. The land-side office was the quickest and most efficient location for PLAINTIFF to pump given it was located closest to PLAINTIFF's workstation.

85. However, Defendant GAYLE instructed PLAINTIFF that she had to breast pump in the mother's lounge, located at the opposite end of the facility.

86. PLAINTIFF explained to Defendant GAYLE that in order to get to the mother's lounge, she had to take a tram from her current workstation.

87. By tram, the mother's lounge was approximately seven (7) minutes away from PLAINTIFF's workstation.

88. Additionally, during the meeting, Defendant GAYLE told PLAINTIFF that legally Defendant GAT only had to provide PLAINTIFF with thirty (30) minutes to pump **per day**.

89. Upon information and belief, Defendant GAYLE's assertion was false.

90. It took PLAINTIFF approximately thirty (30) minutes to breast pump per pumping session; 30 minutes per day did not afford PLAINTIFF the time necessary to breast pump.

91. To restrict PLAINTIFF's pumping breaks, Defendant GAYLE demanded PLAINTIFF arrive early to work and breast pump in the office prior to her shift.

92. Specifically, Defendant GAYLE instructed PLAINTIFF to leave her house at 1:30 p.m., arrive at work at 2:00 p.m., and pump prior to the start of her shift at 3:00 p.m.

93. PLAINTIFF explained to Defendant GAYLE that this proposed plan would not accommodate PLAINTIFF given that her last pump before the start of her shift was around 1:30 p.m.

94. Under Defendant GAYLE's proposal, PLAINTIFF would not be pumping every three hours as instructed by her lactation specialist.

95. Moreover, Defendant GAYLE's proposed plan required PLAINTIFF to arrive to work a full hour prior to the start of her shift, which PLAINTIFF would not be paid.

96. Due to the above-mentioned reasons, PLAINTIFF informed Defendant GAYLE she would not come to work an hourly early to pump.

97. PLAINTIFF left the meeting with feelings of anxiety triggered by ongoing uncertainty about her ability to continue expressing breast milk.

98. The following day, on Monday, June 27, 2022, PLAINTIFF texted Defendant GAYLE and asked if she could have another meeting to discuss her pumping schedule.

99. PLAINTIFF requested Human Resources be present at said meeting.

100. Additionally, in the text message, PLAINTIFF addressed her concern of returning to work four (4) days per week, as she did not wish to subject herself to additional uncertainty surrounding her pump schedule.

101. Prior to going on maternity leave, PLAINTIFF worked four (4) days per week.

102.    Initially, when PLAINTIFF returned from maternity leave, she was to begin at two (2) days per week and gradually increase her days worked per week until she was back to her pre-maternity leave schedule.

103.    PLAINTIFF wrote "**I am worried about even adding on another day until we can find the solution to me pumping w dhen I need to**."

104.    As a result, PLAINTIFF lost two days' worth of compensation per week.

105.    On June 28, 2022, PLAINTIFF had a meeting with Defendant BEATY.

106.    During this meeting, PLAINTIFF asked Defendant BEATY what her rights were as it pertained to expressing breast milk at work.

107.    Defendant BEATY told PLAINTIFF that under the Fair Labor Standards Act ("FLSA"), PLAINTIFF is entitled to a "reasonable break time" and a private location to pump.

108.    Defendant BEATY informed PLAINTIFF that she was only permitted one (1) hour to pump.

109.    PLAINTIFF knew Defendant BEATY's assertion was false.

110.    In response, PLAINTIFF explained that because she was required to breast pump in the mother's lounge, the entire process took her 47 minutes per lactation break inclusive of walking to and from the mother's lounge, setting up her equipment, pumping, and cleaning the equipment.

111.    Moreover, if PLAINTIFF were only permitted to pump one (1) hour per day, PLAINTIFF would only have thirteen (13) minutes for her second pump.

112.    Defendant BEATY chided PLAINTIFF and told her that she should "buy more bottles" so she could cut down on clean time.

113.    PLAINTIFF then asked Defendant BEATY what was considered "reasonable" under the FLSA.

114. PLAINTIFF informed Defendant BEATY that only permitting her to pump during breaks, which were well beyond her three (3) hour pump schedule, was not reasonable.

115. Defendant BEATY became snarky with PLAINTIFF and said PLAINTIFF was not a lawyer.

116. Defendant BEATY attempted to belittle PLAINTIFF when she inquired about her rights to express breastmilk while at work.

117. Defendant BEATY invalidated PLAINTIFF's feelings and told PLAINTIFF she was being "emotional."

118. Visibly upset, PLAINTIFF ended the meeting.

119. Immediately following the meeting, PLAINTIFF contacted the Department of Labor to report Defendant GAT's continuous failure to provide her with requested and necessary lactation breaks.

120. On June 29, 2022, PLAINTIFF sent an email to Defendants GAYLE and BEATY outlining Defendant GAT's failure to accommodate her pumping schedule.

121. Neither Defendant GAYLE nor Defendant BEATY responded to PLAINTIFF's email.

122. On June 30, 2022, PLAINTIFF texted Defendant GAYLE and asked if she could pump at 4:30 p.m. that afternoon pursuant to her pumping schedule.

123. Defendant GAYLE denied PLAINTIFF's request.

124. On Friday, July 1, 2022, PLAINTIFF texted Defendant GAYLE and indicated that she could still perform her job duties if Defendant GAYLE permitted her to pump at 4:30 p.m. and 6:30 p.m.

125. Again, Defendant GAYLE denied PLAINTIFF's request.

126. Invoking her FLSA rights, PLAINTIFF pumped at 4:30 p.m.

127. On July 7, 2022, PLAINTIFF reported to work.

128. Around 3:41 p.m., PLAINTIFF texted Defendant GAYLE and told her that the latest she could pump was 4:45 p.m.

129. In response, Defendant GAYLE informed PLAINTIFF that she was not allowed to pump at 4:45 p.m. and had to wait until 5:30 p.m.

130. PLAINTIFF texted Defendant GAYLE and informed her that she was invoking her right to pump at 4:45 p.m. and instructed Defendant GAYLE to find coverage for her while she pumped.

131. While PLAINTIFF was pumping in the mother's lounge, two airport patrons interrupted PLAINTIFF by knocking on the door and attempting to enter, causing PLAINTIFF to experience additional stress and anxiety.

132. When PLAINTIFF returned from pumping, Defendant GAYLE issued her a write-up for "leaving the workstation" on July 1, 2022.

133. Then, Defendant GAYLE ordered PLAINTIFF to go home for "leaving her workstation to pump" that afternoon.

134. Subsequently, PLAINTIFF went home.

135. On July 8, 2022, when PLAINTIFF arrived at work, Defendant GAYLE called PLAINTIFF into a meeting.

136. During the meeting, PLAINTIFF informed Defendant GAYLE that if she were regularly scheduled to work the gate, she would be able to pump every three (3) hours while not disrupting business operations because, pursuant to Defendant GAT's policy, there are always two

13

(2) people working at the gate and therefore someone would be available to cover for PLAINTIFF while she is pumping.

137.    Upon information and belief, one (1) employee can successfully work the gate.

138.    In fact, PLAINTIFF has worked the gate by herself.

139.    Moreover, PLAINTIFF would only require coverage for about 35 minutes.

140.    PLAINTIFF also asked Defendant GAYLE if she could pump in the office instead of the mother's lounge because the office is closer to PLAINTIFF's job duties.

141.    Defendant GAYLE refused to have any discussion with PLAINTIFF regarding her proposed plan.

142.    Instead, Defendant GAYLE suspended PLAINTIFF until she agreed to "follow company procedure."

143.    As a result, PLAINTIFF went home and did not return to work per Defendant GAYLE's instruction.

144.    Around July 14, 2022, PLAINTIFF learned the Department of Labor contacted Defendant GAT regarding her complaint of Defendant GAT's failure to provide her with reasonable breaks to pump.

145.    Soon after learning the Department of Labor contacted Defendant GAT, PLAINTIFF was removed from all her shifts for the last week of July 2022 and the entirety of August 2022.

146.    Around July 18, 2022, PLAINTIFF filed her sex-based Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") (Charge No.: 533-2022-02265).

147.    Around July 22, 2022, PLAINTIFF contacted Defendant GAT's Human Resources Business Partner, pursuant to Defendant GAT's Dispute Resolution Process, to report Defendant GAT's ongoing sex-based discrimination.

148.    Later that same day, PLAINTIFF emailed Defendants BEATY and GAYLE to inquire about her return to work status.

149.    Specifically, in her email, PLAINTIFF indicated that she was "ready, willing, and able to work" but requested that Defendant GAT "**accommodate me as prescribed by law**."

150.    Instead of addressing PLAINTIFF's request for accommodations, Defendant BEATY discredited PLAINTIFF and told her that her "statement is inaccurate" and to "discuss with [Defendants GARZO and GAYLE].

151.    PLAINTIFF responded to Defendant BEATY and requested undersigned be present at the meeting, to which Defendant BEATY responded, "we do not conduct meetings with lawyers."

152.    Defendant BEATY then claimed PLAINTIFF was scheduled to work and when called to return to work, PLAINTIFF hung up the phone.

153.    However, such statement was untrue, as evidenced by the fact that PLAINTIFF was removed from Defendant GAT's schedule around July 14, 2022.

154.    PLAINTIFF again pleaded with Defendant BEATY informing her that she was "**ready, willing, and able to return to work**."

155.    Defendant BEATY told PLAINTIFF that Defendants GARZO and GAYLE "will try to find time to accommodate a discussion."

156.    As such, PLAINTIFF waited for either Defendant GARZO or Defendant GAYLE to contact her.

157. Later that same day, Defendant GAYLE emailed PLAINTIFF a write-up for "walking away from your station without approval and not taking important security documents. Also your choice not to work your schedule shift with scheduled breaks or follow our company policy and procedures" stemming from July 7, 2022.

158. PLAINTIFF was stunned by this written discipline, as PLAINTIFF was expecting Defendant GAYLE to reach out to her regarding accommodations, not a discipline.

159. Moreover, the allegations contained in the write-up were fabricated.

160. PLAINTIFF did take said documents.

161. Specifically, when PLAINTIFF went to pump on July 7, 2022, PLAINTIFF asked Defendant PORTER for assistance retrieving some of Defendant GAT's property so she would not have to take the items into the mother's lounge with her.

162. However, Defendant PORTER refused to take the items and, as a result, PLAINTIFF took the items with her and returned them to their respective spot.

163. PLAINTIFF responded to Defendant GAYLE stating, "since it is apparent neither you, nor [Defendant BEATY], have any interest in having a meaningful conversation regarding my need for accommodations **due to your continuous FLSA violations, I contacted the HR Business Partner per company policy**."

164. In response, Defendant GAYLE told PLAINTIFF, "[w]e are now telling you in writing that we are happy to discuss with you again ways for you to pump while making sure your work is not affected."

165. PLAINTIFF texted Defendant GAYLE and told her "**I am willing to discuss ways in which GAT can accommodate me but I am concerned GAT will continue to retaliate against me as evidenced by my suspension and write-ups. Please advise**."

16

166. Despite ensuring that she would discuss accommodations with PLAINTIFF, Defendant GAYLE never contacted PLAINTIFF.

167. As a result of Defendant GAYLE's failure to engage in any discussions with PLAINTIFF regarding her pumping schedule, PLAINTIFF remained out of work.

168. Around August 10, 2022, in a text thread with Defendants FOLLOWELL, GAYLE, and PORTER, Defendant FOLLOWELL texted PLAINTIFF and requested she return her work badge.

169. In the text thread, Defendant FOLLOWELL indicated that "[o]nce this situation is resolved and you are ready to return to work, we are able to start the process of getting it re-instated."

170. In response, PLAINTIFF texted Defendants FOLLOWELL, GAYLE, and PORTER stating, "**I have emailed [Defendant GAYLE] multiple times inquiring about my return to work. I am, and have always been, ready to work. I have emailed [DEFENDANT GAYLE] countless times about returning to work. In my most recent email correspondence, I emailed [Defendant GAYLE] and indicated that I was 'willing to discuss ways in which GAT can accommodate me but I am concerned GAT will continue to retaliation [sic] against me as evidenced by my suspension and write-ups. Please advise.' To date, I have never received a response. As indicated by my multiple correspondences to [Defendant GAYLE] and others, I am ready and able to work, but I have no had any discussions with GAT regarding my pump schedule**."

171. Defendants FOLLOWELL, GAYLE, and PORTER did not respond to PLAINTIFF.

172.    On August 11, 2022, undersigned emailed a "Letter of Preservation and Demand for Preservation" to Defendant GAYLE informing her that PLAINTIFF intended to vindicate her rights were violated by Defendant GAT.

173.    Undersigned did not receive a response from DEFENDANT GAYLE.

174.    A few hours later, PLAINTIFF received an "Exit Interview" from the Defendant GAT's Human Resources Department.

175.    Plaintiff then received a notification that she had been signed out of her Defendant GAT Google account.

176.    When PLAINTIFF attempted to sign into her Defendant GAT Google account, PLAINTIFF was presented with a notification that read, "Account deleted."

177.    On August 17, 2022, Defendant BACON emailed PLAINTIFF a "Notice of Separation" indicating PLAINTIFF was terminated as of August 10, 2022.

178.    Per the "Notice of Separation," signed by Defendant COOGAN, PLAINTIFF was terminated for "job abandonment."

179.    PLAINTIFF was shocked by her termination.

180.    Defendants' reason for terminating PLAINTIFF are pretextual.

181.    Upon information and belief, PLAINTIFF's termination was because of her sex/gender and disability and/or opposition to Defendants' unlawful conduct and comments.

182.    As a result of Defendants' actions, PLAINTIFF felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

183.    As a result of the acts and conduct complained of herein, PLAINTIFF has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and PLAINTIFF also suffered future pecuniary

18

losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

184. That as a result of Defendants' conduct, the PLAINTIFF was caused to sustain serious and permanent personal injuries, including but not limited to permanent psychological injuries.

185. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, PLAINTIFF demands Punitive Damages as against all the Defendants, jointly and severally.

186. PLAINTIFF claims that Defendants unlawfully discriminated against PLAINTIFF because of her sex/gender and disability and because she complained of and opposed the unlawful conduct of Defendants related to the above protected classes.

187. The above are just some of the examples of the unlawful discrimination to which the Defendants subjected PLAINTIFF.

188. DEFENDANTs have exhibited a pattern and practice of not only discrimination but also retaliation.

189. PLAINTIFF claims alternative that PLAINTIFF is an Independent Contractor, and PLAINTIFF makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, PLAINTIFF claims that Defendant owed and breached its duty to PLAINTIFF to prevent the harassment, discrimination, and retaliation and is liable therefore for negligence.

190. PLAINTIFF claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

**COUNT I**
**VIOLATIONS OF FLSA PROTECTIONS FOR NURSING MOTHERS**
**29 U.S.C. § 207(r)**
**(against Defendant GAT only)**

191.    Plaintiff, Madison Weaver, repeats every allegation made in the above paragraphs of this complaint.

192.    Section 4207 of the Patient Protection and Affordable Care Act ("ACA"), which amended Section 7 of the FLSA, 29 U.S.C. § 207, requires employers to provide "reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk." 29 U.S.C. § 207(r)(1)(A).

193.    The FLSA and the "Break Time for Nursing Mothers" provision cover all public agency employees of a State, a political subdivision of a State, or an interstate government agency. 29 U.S.C. § 203(s)(1)(C).

194.    The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee, including individual supervisors and management officials. 29 U.S.C. § 203(d).

195.    Defendant violated Plaintiff's rights under the FLSA by failing to provide reasonable break time for Plaintiff to "express breast milk for her nursing child for 1 year after the child's birth each time she had a need to express the milk."

196.    The foregoing actions, policies and practices of Defendant violate the FLSA.

197.    Defendant's actions were willful, in bad faith and in reckless disregard of clearly applicable FLSA provisions.

198.    Defendant is liable to Plaintiff for actual damages, liquidated damages and other relief, pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs and expenses.

**COUNT II**
**FLSA RETALIATION**
**29 U.S.C. § 215**
**(against Defendant GAT only)**

199.    Plaintiff, Madison Weaver, repeats every allegation made in the above paragraphs of this complaint.

200.    The FLSA prohibits retaliation by employers against employees for asserting their rights under the Act. 29 U.S.C. § 215(a)(3).

201.    Defendant violated the FLSA's anti-relation provision when it took materially adverse employment actions against Plaintiff for asserting her rights under the Break Time for Nursing Mothers law.

202.    As a result of Defendant's violations of the FLSA, Plaintiff has suffered damages, including, but not limited to: loss of employment, diminishment of career opportunities, past and future lost wages, reputational harm, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

203.    The foregoing actions, policies and practices of Defendant violate the FLSA.

204.    Defendant's actions were willful, in bad faith and in reckless disregard of clearly applicable FLSA provisions.

205.    Defendant is liable to Plaintiff for actual damages, liquidated damages and other relief, pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs and expenses.

**COUNT III**
**DISCRIMINATION**
**UNDER TITLE VII**
**(against Defendant GAT only)**

206.   Plaintiff, Madison Weaver, repeats every allegation made in the above paragraphs of this complaint.

207.   Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

208.   Title VII further provides that "it shall be an unlawful employment practice for any employer . . . controlling . . . training or retraining, including on-the-job training programs to discriminate against any individual because of [her] race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide. . . training." 42 U.S.C. § 2000e-2(d).

209.   In 1978, Congress enacted the Pregnancy Discrimination Act, 92 Stat. 2076, which added new language to Title VII's definitions subsection to specify that Title VII's "ter[m] 'because of sex' . . . include[s] . . . because of or on the basis of pregnancy, childbirth, or related medical conditions.; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k); Young v. United Parcel Serv., Inc., 135 S. Ct. 1344-45 (2015) (explaining "that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act.").

210.   Title VII further provides that "un unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was

a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

211.    Defendant GAT engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiff with respect to her compensation, terms, conditions, training and privileges of employment because of her sex and pregnancy.

212.    Defendant GAT subjected Plaintiff to adverse tangible employment actions—defined as significant changes in Plaintiff's employment status, discipline, denial of training, failure to promote, reassignment with significantly different job responsibilities, and decisions causing changes in significant changes in her employment benefits.

213.    Plaintiff's protected characteristics (sex and pregnancy) played a determinative factor in Defendant GAT's decisions.

214.    Defendant GAT cannot show any legitimate nondiscriminatory reasons for its employment practices and any reasons proffered by Defendant GAT for its actions against Plaintiff are pretextual and can readily be disbelieved.

215.    Alternatively, Plaintiff's protected status played a motivating part in Defendant GAT's decisions even if other factors may also have motivated its actions against Plaintiff.

216.    Defendant GAT acted with the intent to discriminate.

217.    Defendant GAT acted upon a continuing course of conduct.

218.    As a result of Defendant GAT's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

23

**COUNT IV**
**HOSTILE WORK ENVIRONMENT**
**UNDER TITLE VII**
**(against Defendant GAT only)**

219.    Plaintiff, Madison Weaver, repeats every allegation made in the above paragraphs of this complaint.

220.    Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment. Harris v. Forklift Systems, 510 U.S. 17, 21 (1993).

221.    An employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998)

222.    Respondeat superior liability for the acts of non-supervisory employees exist where "the defendant knew or should have known of the harassment and failed to take prompt remedial action." Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990).

223.    Employer liability for co-worker harassment also exists where "the employer failed to provide a reasonable avenue for complaint." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 105 (3d Cir. 2009).

224.    The Third Circuit has held that the retaliation provision of Title VII "can be offended by harassment that is severe or pervasive enough to create a hostile work environment." Jensen v. Potter, 435 F.3d 444, 446 (3d Cir. 2006).

225.    Here, Defendant's conduct occurred because of Plaintiff's legally protected characteristics and was severe or pervasive enough to make a reasonable nursing mother

believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

226.    The harassing conduct directly refers to Plaintiff's sex traits and pregnancy.

227.    Defendant GAT delegated to Plaintiff's supervisors the authority to control the work environment and they abused that authority to create a hostile work environment.

228.    Harassing conduct based on Plaintiff's sex and pregnancy filled the environment of Plaintiff's work area.

229.    Defendant GAT knew that the harassing conduct filled Plaintiff's work environment.

230.    Harassing conduct occurred daily.

231.    Harassing conduct caused Plaintiff to sustain severe emotional distress resulting in physical illness and serious psychological sequelae.

232.    Plaintiff subjectively regarded the harassing conduct as unwelcome and unwanted and objectively opposed the conduct.

233.    The conduct was both severe and pervasive.

234.    The conduct was humiliating.

235.    The conduct unreasonably interfered with Plaintiff's work performance.

236.    The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

237.    Defendant GAT provided a futile avenue for complaint.

238.    Defendant GAT retaliated against Plaintiff for her complaints.

239.    Defendant GAT acted upon a continuing course of conduct.

240.    As a result of Defendant GAT's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental

25

anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT V**
**RETALIATION**
**UNDER TITLE VII**
**(against Defendant GAT only)**

241.   Plaintiff, Madison Weaver, hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

242.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer: "(1) to…discriminate against any of his employees…because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this subchapter."

243.   Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management.").

244.   Title VII's anti-retaliation provision also protects employees who speak out about discrimination by answering questions during an employer's internal investigation. Crawford v. Metropolitan Gov't of Nashville and Davidson Cty., Tennessee, 555 U.S. 271, 277 (2009) (declaring that there is "no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own

26

initiative but not one who reports the same discrimination in the same words when her boss asks a question.").

245.    Retaliation need not be job-related to be actionable under Title VII—an employer can effectively retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace. White, 548 U.S. at 61-62 (rejecting authority from the Third Circuit and others requiring that the plaintiff suffer an adverse employment action in order to recover for retaliation).

246.    "[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith, reasonable belief that a violation existed.'" Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996); Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993); and Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), overruled on other grounds by Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995).

247.    An employee need not be a member of a protected class to be subject to actionable retaliation under Title VII. See Moore, 461 F.3d at 342 ("Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class."

248.    Title VII not only bars retaliation against the employee who engaged in the protected activity; it also bars retaliation against another employee if the circumstances are such that the retaliation against that employee might well dissuade a reasonable worker from engaging in protected activity. See Thompson v. North American Stainless, LP, 131 S. Ct. 863, 868 (2011).

249.    Here, Defendant GAT, and its' supervisory employees, retaliated against Plaintiff because of her protected activity under Title VII.

27

250. Plaintiff acted under a reasonable, good faith belief that her right to be free from discrimination on the basis of sex/gender was violated.

251. Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

252. Defendant GAT, and its' supervisory employees, engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

253. There was a causal connection between the Defendant GAT, and its' supervisory employees, materially adverse actions, and Plaintiff's protected activity.

254. Defendant GAT, and its' supervisory employees, actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

255. Defendant GAT, and its' supervisory employees, acted upon a continuing course of conduct.

256. Plaintiff will rely on a broad array of evidence to demonstrate a causal link between their protected activity and the Defendant GAT, and its' supervisory employees, actions taken against her, such as the unusually suggestive proximity in time between events, as well as Defendant GAT supervisory employees' antagonism and change in demeanor toward Plaintiff after Defendant GAT, and its' supervisory employees, became aware of Plaintiff's protected activity.

257. As a result of the Defendant GAT, and its' supervisory employees, violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life,

humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT VI**
**DISCRIMINATION**
**UNDER ADA**
**(against Defendant GAT only)**

258. Plaintiff, Madison Weaver, incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

259. Defendants is/are an employer(s) under the ADA as it/they is/are engaged in an industry affecting commerce that has 15 or more employees for each working day in each of 20 or more calendar weeks, in the current or preceding calendar year.

260. Plaintiff is a qualified individual with a disability as she has/had "a physical or mental impairment that substantially limits one or more major life activities of such individual" and/or "being regarded as having such an impairment." 42 U.S.C. §12102(a) *and also* 29 C.F.R. §1630.2(g).

261. Specifically, Plaintiff's post pregnancy condition substantially limits and/or impaired her ability to perform everyday activities.

262. Alternatively, Defendant perceived Plaintiff as disabled.

263. Defendant, by and through Plaintiff's supervisors and handlers, harassed and disparately treated Plaintiff based on Plaintiff's disability, including but not limited to

  a. wrongful termination;

  b. disparate discipline;

  c. denial of leave of absence or reasonable accommodation; and,

  d. other treatment that was wrongful and disparate on the basis of disability.

264. Defendant failed to reasonably accommodate Plaintiff and/or engage the interactive process with regard to Plaintiff's need for ongoing leave of absence.

265. As a direct and proximate result of Defendants' discrimination, Plaintiff has suffered loss of wages, including loss of back pay, loss of front pay, loss of amenities of employment and out of pocket expenses, emotional damages, embarrassment, humiliation, loss of reputation, and other similar damages, all to Plaintiff's great detriment.

266. Defendants' actions were willful and wanton and thus require the imposition of punitive damages.

267. Alternatively, as Defendants considered Plaintiff's disability in the foregoing discrimination and conduct, Plaintiff is entitled to a charge for mixed-motive discrimination, which entitles Plaintiff to an award of Attorney's fees

268. As a result of the Defendant GAT, and its' supervisory employees, violations of ADA, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT VII**
**RETALIATION**
**<u>UNDER ADA</u>**
**(against Defendant GAT only)**

269. Plaintiff, Madison Weaver, incorporates the foregoing paragraphs as if set forth at length herein.

270. Plaintiff engaged in protected activity when she requested accommodations for her post-pregnancy complications.

271. Defendants retaliated against Plaintiff as follows:

      a.   wrongful termination;

      b.   disparate discipline;

      c.   denial of leave of absence; and,

      d.   other treatment that was wrongful and disparate on the basis of disability.

272.    Defendants' foregoing negative and adverse actions and treatment were temporally proximate to Plaintiff's protected activity such that they are unusually suggestive of a retaliation and thus no further evidence is required of retaliation.

273.    Alternatively, evidence exists to show Defendants' foregoing negative and adverse treatment and conduct was causally related to the protected activity, and thus retaliatory.

274.    As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered loss of wages, including loss of back pay, loss of front pay, loss of amenities of employment and out of pocket expenses, emotional damages, embarrassment, humiliation, loss of reputation, and other similar damages, all to Plaintiff's great detriment.

275.    Defendants' actions were willful and wanton and thus require the imposition of punitive damages.

276.    Alternatively, Defendants' actions were motivated by the foregoing discrimination and thus Plaintiff is entitled to attorney's fees under the mixed-motive theory of liability.

277.    As a result of the Defendant GAT, and its' supervisory employees, violations of Title ADA, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## COUNT VIII
## DISCRIMINATION
## UNDER PHRA § 955
### (against Defendant GAT)

278.    Plaintiff, Madison Weaver, repeats and realleges every allegation made in the above paragraphs of this complaint.

279.    Plaintiff's PHRA claims are still pending before the EEOC and PHRC.

280.    Plaintiff will seek leave to amend this complaint at the appropriate time to assert her PHRA claims against Defendants. See Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleasing), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

## COUNT IX
## RETALIATION
## UNDER PHRA § 955
### (against Defendant GAT)

281.    Plaintiff, Madison Weaver, repeats and realleges every allegation made in the above paragraphs of this complaint.

282.    Plaintiff's PHRA claims are still pending before the EEOC and PHRC.

283.    Plaintiff will seek leave to amend this complaint at the appropriate time to assert her PHRA claims against Defendants. See Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleasing), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

## COUNT X
## DISCRIMINATION
## UNDER PHRA – AIDING AND ABETTING
### (against individually named Defendants only)

284.    Plaintiff, Madison Weaver, repeats and realleges every allegation made in the above paragraphs of this complaint.

285.    Plaintiff's PHRA claims are still pending before the EEOC and PHRC.

286.    Plaintiff will seek leave to amend this complaint at the appropriate time to assert her PHRA claims against Defendants. See Federal R. Civ. P. 159a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleasing), and 15(d) (Plaintiff may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

## JURY DEMAND

PLAINTIFF requests a jury trial on all issues to be tried.

## DEMAND TO PRESERVE EVIDENCE

The Defendants are hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to her potential claims, her claims to damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.

## PRAYER FOR RELIEF

**WHEREFORE**, PLAINTIFF demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, liquidated damages,

statutory damaged, attorney's fees, costs, and disbursement of action; and for such other relief as

the Court deems just and proper.

**DEREK SMITH LAW GROUP, PLLC**

*/s/ Tova L. Rabin*_____
Tova L. Rabin, Esq.
1835 Market Street
Suite 2950
Philadelphia, PA 19103
tova@dereksmithlaw.com
267-332-1692

May 24, 2023