IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MADISON WEAVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 23-869 |
| GAT AIRLINE GROUND SUPPORT, | ) | Judge Nora Barry Fischer |
| INC.; CHRISTINA GAYLE; HOLLY | ) | |
| FOLLOWELL; and WILMA BEATY | ) | ECF No. 63 |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

In this action, Plaintiff Madison Weaver brings various employment discrimination and retaliation claims against Defendants GAT Airline Ground Support, Inc. ("GAT") and its supervisory employees Christina Gayle, Holly Followell and Wilma Beaty, arising from Plaintiff's employment by GAT at the Pittsburgh, Pennsylvania International Airport.    (Docket No. 10). Presently before the Court is a Motion for Summary Judgment brought by Defendants as to Plaintiff's remaining claims (Docket No. 63),[1] together with Defendants' Brief in Support, Plaintiffs' Response in Opposition, and the parties' Concise Statements of Material Fact, supportive exhibits and further replies.  (Docket Nos. 64-67 and 73-79).

---

[1] By its Memorandum Opinion of February 20, 2024 (Docket No. 25), the Court granted Defendants' Partial Motion to Dismiss as to Plaintiff's claims under (a) the Providing Urgent Maternal Protections ("PUMP") for Nursing Mothers Act, Pub. L. No. 117-328, § 102(a)(1), 136 Stat. 6093, 6093 (2022), at Counts III and IV and (b) the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12102 *et. seq.*, at Counts VIII and IX.  Said motion was otherwise denied.

As discussed in the prior Memorandum Opinion, Plaintiff's claims at Counts I and II were properly brought under Section 207(r), which was added to the FLSA effective March 2010.  In April 2023, that section was fully repealed and replaced by the broader nursing mothers' protection/enforcement provisions of the PUMP Act (which had been enacted the previous December).  Effectively, the PUMP Act moved the FLSA's reasonable break provision from 29 U.S.C. § 209(r) to 29 U.S.C. § 218d, but did so *subsequent* to the relevant time period of this action.

Plaintiff's pending claims, as set forth in her First Amended Complaint, are as follows:

**Counts I and II** - violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*;

**Counts V through VII** – violations of  Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. 2000e(k); and

**Counts X through XII** – violations of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951 *et. seq.*[2]

Plaintiff alleges being subjected to discrimination, harassment/hostile work environment, retaliation, and wrongful termination and seeks "declaratory and injunctive relief, actual damages, compensatory damages, punitive damages, reinstatement, attorneys' fees, litigation costs, and pre- and post-judgment interest".  (Docket No. 10).

More specifically, Plaintiff alleges that Defendants – for reasons of discrimination and retaliation – refused to provide her reasonable accommodations for her legally protected rights - as a new mother returning from maternity leave while nursing a then approximately two-month-old baby – to pump as necessary (as informed by lactation needs, medical advice and applicable regulations and guidelines) in a private space.  She further alleges that she was harassed/subjected to a hostile work environment by Defendants and retaliated against for (a) advocating for her nursing rights, (b) objecting to Defendants' treatment and refusals to provide accommodation required by law, and (c) making formal complaints to GAT, the Department of Labor ("DOL"), the  Equal  Employment  Opportunity  Commission  ("EEOC")  and  the  Pennsylvania  Human

---

[2] As noted *infra*, the PHRA is construed consistently with interpretations of the parallel federal law referenced in text above. Count XII – Aiding and Abetting Discrimination Under the PHRA is brought against Individual Defendants. (Docket No. 10 at ¶¶ 291-92).

Relations Commission ("PHRC").  Plaintiff expressly alleges that Defendants retaliated against her for engaging in protected activities through further denials of lactation accommodation, false and retributive disciplinary actions, and pretextual termination. (Docket Nos. 10 and 74).

Defendants respond that GAT's employment practices complied with all applicable law, and that Plaintiff has failed to state any maintainable claim.  They seek, in the asserted absence of any material fact question, summary judgment in their favor on all of Plaintiff's remaining claims. More particularly, Defendants attest that "GAT did not deny Plaintiff reasonable breaks and a private space to pump – she was simply frustrated that she was not able to take breaks whenever and wherever she pleased."  GAT attests that it is an airline ground transportation support enterprise with (a) limited operations at its Pittsburgh Airport location; (b) a small staff of Customer Service Agents ("CSAs") who rotate between ticketing/check-in, baggage security, and gate responsibilities; and (c) one small office space which contained its equipment and files, in which employees could also take their break(s) and meal(s).[3]  It evidences the following attempts to provide reasonable accommodation: (a) when Plaintiff returned to twice-weekly work, GAT placed her on its 3pm-10pm shift because it had only two flights in that work window; and it then progressively also (b) assigned her to ticketing to reduce her required-presence operational-time windows and then to the gate to provide her the closest location to the mother's lounge; (c) offered her a 5:30 p.m. to 7:15 p.m. block of break time each shift in which to pump; and ultimately also (d) offered to compensate her to arrive early to pump just prior to her shift.  (Docket No. 65 at ¶

---

[3] GAT has rights to no other private Pittsburgh airport space and the distance of its operations from the airport's public-use "mother's lounge" is substantial, *i.e.,* reasonably as much as approximately 15 minutes including requisite walking, passing through employee security points, and travel by public tram.  (Docket Nos. 25, 64).  Plaintiff's supervisor acknowledges making no inquiry regarding potentially available closer space for Plaintiff's private nursing needs (*e.g.,* through employee facilities/spaces available to a larger airline carrier/ground transport services operation). (Docket No. 76 at 441-42).

42).  Defendants further attest that GAT's disciplinary actions and termination were legitimate and based on Plaintiff's own conduct, including (a) leaving her post during an essential operational window without notice and with GAT property necessary to its ongoing operations and (b) abandonment of her job by failing to report to work multiple times without notification.  (Docket No. 65 at ¶¶ 52-75).

The motion has been fully briefed and the parties have not requested oral argument.  Upon careful consideration of the parties' pleadings, together with applicable law and the evidence of record, and for the following reasons, Defendants' Motion for Summary Judgment will be granted as to Count I, violation of "Break Time for Nursing Mothers" provisions of the FLSA, 29 U.S.C. § 207(r),  and otherwise denied.  With the sole exception of Count I, this action presents a plethora of material fact questions which preclude summary judgment on the remaining counts.  A jury could quite reasonably find that the record evidence sufficiently supports any or all of Plaintiff's other remaining claims and reach a verdict in her favor.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.    Factual History

The following facts are relevant, evidenced of record and read in the light most favorable to Plaintiff as non-movant.[4]  *See generally* Docket No. 25; Docket Nos. 63-67, 77-78 (Defendant's Motion, Brief in Support, Concise Statement of Material Facts ("CSMF"), Appendix Exhibits and

---

[4] Although the parties dispute various facts, especially relating to the substance and tenor of Plaintiff's interactions with her supervisors during her reduced-time return-to-work interval of June and July 2022, the record – to which Plaintiff in particular makes less direct citation than the Court expects – includes the parties' deposition testimony, internal documents and numerous written personal communications, as well as documentation of Plaintiff's formal complaints at various stages of her attempted return to work, which collectively provide sufficient evidentiary support for the version of facts recited herein.

further replies); Docket Nos. 74-76 (Plaintiff's Brief in Opposition, Counter Statement of Material Facts, and Appendix Exhibits).[5]

GAT generally provides airport ground support to commercial aviation clients at airports at which that client has limited operations and aircraft movements, and thus no base operations employees. Plaintiff was employed as a GAT above wing CSA at PIT beginning in August 2021. During her employment at PIT, Defendant Christina Gayle was GAT's General Manager in charge of GAT's operations, Holly Followell was a supervisor of CSAs, and Wilma Beaty was GAT's Chief Human Resources Officer and General Counsel.  (Docket No. 65 at ¶¶ 1-5, 24). "At all times, Plaintiff was paid more than minimum wage for each shift she worked – even taking into account unpaid breaks." (*Id.* at ¶ 39) (citing Ex. 7).

GAT contracted with one airline at PIT, and its above wing CSAs' primary job responsibilities were: (1) manning the airline ticket counter; (2) handling gate operations; and (3) staffing the Baggage Service Office at baggage claim during flight operations.  At PIT, GAT's "staffing model" was to schedule three (3) above wing CSAs per shift and assign responsibilities based on need.  Each flight's above wing operations cycle can take up to three to four hours. The ticket counter was open from two-to-three hours before until 30 minutes before the flight and, "depending on operational needs", one-to-two CSAs staffed the ticket counter while open. Ticketing CSAs assisted passengers with baggage and boarding passes. (*Id.* at ¶¶ 8-10, 13-19). GAT also staffed one-to-two CSAs at the gate to bring in the plane and attach the jet bridge, manage deboarding and boarding, and remain at the gate several minutes after flight departure to

---

[5] The factual background then of record was previously set forth at length in the Court's Memorandum Opinion on Defendants' Partial Motion to Dismiss.  (Docket No. 25).

finish and store necessary paperwork for security and airline records.[6]  GAT was also required to keep one CSA at the airline's Baggage Service Office during operations to ensure baggage security. (*Id.* at 8-10, 13 -16, 18-20).[7]

GAT had a shared office space near ticketing where documents were stored and employees could take breaks and meals.  A PIT space designated for nursing mothers was available to passengers and employees in the gate area (in the "airside" terminal) - a TSA security checkpoint, train/tram ride and approximately five-to-seven minute walk from Plaintiff's work area (which was located, together with the ticketing and baggage service areas, in the "landside" terminal). CSAs were scheduled for one 30-minute, between-flight-operations break for every four hours worked; however, employees were free to either complete clerical or custodial tasks, or take an extended unpaid break, during the typically longer interval between flight operation cycles.  (*Id.* at ¶¶ 11-12, 21-23; Docket No. 75 at ¶ 80).[8]

In October 2021, Plaintiff informed GAT that she was pregnant; in late March, 2022, she began her maternity leave, returning to work - on a transitional, reduced schedule of two (2) days per week with intent to return to four (4) days per week - on approximately May 26th. She was scheduled to work the afternoon (3 p.m. to 10 p.m.) shift, which covered a 5:05 p.m. and 9:15 p.m.

---

[6] GAT kept various documentation/paperwork and equipment at the gate, including two radios – one to communicate with other agents, and the "in range" radio to communicate with the flight captain. (*Id. at* 17).

[7] The Court notes the potential tension between GAT's staffing model of three (3) above wing CSAs for its sole PIT client with limited flights, the overlapping timing of assignment responsibilities, and the possibility that operational needs for a shift could require up to five (5) such CSAs.

[8] Thus, a CSA working GAT's standard seven (7) hour shifts would be entitled to one 30-minute break between his/her two (2) flights, and allowed to take the remaining between-flight time as either paid clerical/custodial work time or unpaid extended break. *Cf.* Docket No. 66-1 at 21-23 (Gayle Deposition) (testifying that CSAs received a specific break time of "at least 30 minutes" between flights, but they "were allotted longer" because GAT had a 60 to 90 minute gap between flight windows).

The Court also notes the potential tension between (a) employees' scheduled 30- minute break and "typical" additional optional (unpaid) break time and (b) two flight cycles that could take between three to four hours each scheduled in the 3 p.m. to 10 p.m. shift staffed by three (3) CSAs required to be at their assigned stations until completion of their flight operation duties. *See* text *supra*; Docket No. 65 at ¶¶ 14,19,  22-23.

flight.  GAT concluded this shift was adequate to Plaintiff's need to pump as its flight operations

interval (5:30 p.m. to 7:15 p.m.) allowed her to "do whatever [she] needed to" in between.  (*Id.* at

¶¶ 25-32).[9]

On return to work, Plaintiff informed GAT that she was nursing and that her lactation

specialist recommended she pump milk every three hours to avoid pain and blockages.[10]  Yet,

GAT often made her wait beyond that interval due to "operational demands".  Within the first

month of her return to work on a twice-weekly schedule,[11] Plaintiff was unable to pump at the

recommended and needed three-hour intervals on multiple days, and on some of these days she

was required to take a pumping break when it was *not* needed.[12]  By late June, Plaintiff had suffered

---

[9] GAT's lactation policy provides:

> [GAT] accommodates lactating team members by providing a reasonable amount of break time to
> any team member who desires to express breast milk for an infant child. The break time shall, if
> possible, run concurrently with any break time already provided to the team member. Any break
> time provided to express breast milk that does not run concurrently with break time already provided
> to the team member shall be unpaid. However, if providing such break time would seriously disrupt
> the operations of our business, we may deny break time to team members who [wish] to express
> breast milk.  We will make reasonable efforts to provide team members who need a lactation
> accommodation with the use of a room or other private location other than a toilet stall that is located
> close to the team member's work area.

> (*Id.* at ¶ 40).

[10] As discussed in the Court's prior Memorandum Opinion, federal regulatory agency guidance, such as the
Department of Labor's interpretive Notice to employers regarding nursing, anticipates a mother's need to pump every
two (2) to three (3) hours for a baby up to six months old, and thus advises that she will require accommodations to
pump two (2) to three (3) times in an eight (8) hour shift. (Docket No. 25) (discussing 75 Fed. Reg. 80073 (Dec. 21,
2010). The lactation specialist advised Plaintiff, who was pumping every two hours when her daughter was newborn,
to set a goal of pumping eight (8) times a day, in addition to nursing; she was therefore endeavoring to pump every
three hours. Defendants and Plaintiff dispute the significance to her work-day pumping needs of lactation logs
indicating that when at home (*i.e.*, nursing at the same time), Plaintiff sometimes went more than three hours between
sessions.  (Docket No. 65 at ¶¶ 33-38; Docket No. 75 at ¶¶ 36-38).

[11] Although Plaintiff planned to return to work full time, she was now hesitant to work/schedule out additional days
for fear that Defendants' failure to accommodate her pumping needs would more adversely affect her milk supply.
(Docket No. 75 at ¶¶ 77).

[12] In addition, Plaintiff's testimony is that she was initially directed to pump in GAT's office/breakroom near the ticket
counter (where GAT employees also clocked in and stored personal items), but because Defendants failed to designate
this as a sometimes private space, coworkers unlocked the door and walked in on Weaver while she was pumping. *Cf.*
Docket No. 65 at ¶ 44 (stating that Plaintiff could not be permitted to use that shared space). And her supervisors (a)
"at one point instructed her to use a public family bathroom on the landside near the ticket counter to pump" so she
would not have the long travel time to the airside mother's lounge, and (b) suggested that she should simply "take
leave" while breastfeeding.  (Docket No. 75 at ¶¶ 79, 82, 84).  That said, the parties appear to agree that Plaintiff was,

a clogged milk duct as a result. (Docket No. 75 at ¶¶ 76-78; Docket No. 74 at 9-10; Docket No. 10 at ¶¶ 38-62; Docket No. 76 at 93).

Plaintiff and her supervisors had multiple discussions regarding her concerns within the weeks following her return to work.  Accommodations which GAT then considered/attempted included (a) assigning her exclusively to the ticket counter, which closed earlier than the gate and would allow her to start her break and pump earlier; (b) assigning her exclusively to the gate so that she would be closer to the mother's lounge; and (c) scheduling her to different shifts (*e.g.*, the 3 to 10 shift which had the fewest flights).  GAT later also offered to compensate Plaintiff to clock-in to work thirty to forty-five minutes early to pump prior to the first flight in the afternoon.  GAT could not and did not, however, "permit Plaintiff to leave her assigned location in the middle of flight operations, as it would be a 'serious disruption' to operations", although she was permitted to "take breaks as quickly [thereafter] and as often as operations would allow." (Docket No. 65 at ¶¶ 41-43).  *See also* Docket No. 75.[13]

During this return to work interval, Plaintiff was admonished for breastfeeding needs; advised to stay home until she was done nursing/pumping; subjected to demeaning comments regarding her post-partum emotional state and mistaken beliefs as to accommodation because she is not a lawyer;  belittled/embarrassed in front of work colleagues, including by being sent home mid-shift; and endured daily expressions of annoyance and hostility because her requests for adequate accommodation (outside the confines of the single between-flight-operations window in

---

whether initially or subsequently, required to use the mother's lounge as the only "reasonably" available private pumping space. (*See supra*; *id.* at ¶ 44).

[13] *See also* Docket No. 76 at 77-78 (although Plaintiff could not fully recall in deposition the multiple times she was unable to pump as needed or the discussions about it, she believed "most of them are in [her] complaint" and confirmed to defense counsel that "Gayle told [Plaintiff that she] couldn't [pump] during operations"); Docket No. 66-1 at 17 ("There were times that [Plaintiff's three hour pumping schedule was] not when her break was and the operational need did not give [GAT] the leeway to allow her to do so . . . [b]ecause [GAT had] a three to four-hour range" to complete all requisite flight operation procedures.)

which GAT permitted its regularly scheduled break and unpaid extensions) were a "problem", as "pumping during operations was not an option." *See e.g.,* Docket No. 76 at 27–28 (Plaintiff interacted with Gayle multiple times and day, which made her anxious because Gayle was hostile toward Plaintiff, regarded her pumping needs as a problem, and told her she should consider not working until she was through pumping); *id.* at 35-36 (Plaintiff felt like she "was walking on egg shells" because she "had to fight with [her supervisors] for [her] right to breastfeed every time [she] came into work" as each supervisor sometimes told her she was not allowed to pump when needed and was" only allowed to pump on [GAT's] schedule"); *id.* at 43-44 (Followell told Plaintiff she was not allowed to pump during flight operations and that she should pump in the closest family bathroom); *id.* at 62-63 (Beaty told Plaintiff she should reduce her pumping cleaning time, was emotional, was not a lawyer, and that she had a legal right to pumping breaks totaling no more than one hour per day).[14]

On June 27, 2022 Plaintiff asked Gayle to set up a meeting with HR because she was "concerned about being able to pump as frequently as [needed]". (Docket Nos. 65 at ¶ 48; 66-2 at 24). After meeting with Beaty on the following day, Plaintiff sent an email to Beaty and Gayle on June 29, reiterating that her work schedule required her to exceed her allotted time of three hours between pumping, and disclosing her intent to file a complaint with the DOL. (Docket No. 65 at ¶ 49).

The following day, June 30, Plaintiff requested accommodation to pump as needed at 4:30 pm, which was denied. Plaintiff complained to Gayle that she was unable to pump until 54 minutes

---

[14] *See also id.* at 84-87 (Plaintiff felt that her supervisors and employer were harassing her, singling her out for her need to pump, and "being difficult on purpose" because she was trying to pump as needed and also not disrupt flight operations many different times – like watching flight schedules and pumping in time to be back before landing (before two people were needed) and still meet GAT's operational needs – but then she was told she could not leave only one person at that post, even though the post could be and was managed by one CSA, including Plaintiff, when that was needed for other reasons).

9

after the time requested.[15]  (Docket Nos. 65 at ¶ 52; 66-3 at 3).  On July 1, Plaintiff texted Gayle, informing her that the "absolute latest" she could pump was 4:30, and requesting assistance in scheduling and coverage "if and where needed while I am pumping".  (Docket No. 66-3 at 7).  After Gayle again denied Plaintiff's request, telling Plaintiff she would "have to continue with how the assignments are set up for the day", Plaintiff invoked her FLSA rights and pumped at the requested time nonetheless.  (Docket Nos. 65 at ¶ 55; 66-3 at 9).  On July 3, Gayle "wrote-up" Plaintiff for leaving her post without authorization on July 1.  (Docket Nos. 65 at ¶ 59; 66-3 at 9).

When Plaintiff reported to work on July 7, she informed Followell that she would leave her post at 4:45 pm to pump, to which Followell responded by instructing Plaintiff to wait until after work on the 5:05 pm flight was completed.  (Docket Nos. 65 at ¶ 60; 66-2 at 17).  Plaintiff nevertheless left her post to pump as planned (taking radios, paperwork and bag tags with her for safekeeping).  (Docket Nos. 65 at ¶¶ 61-2; 66-3 at 17).  When Plaintiff returned to the office that evening, Followell sent her home "for insubordination for walking away in the middle of operation", and informed her that "she needed to be able to report to work and complete her assigned duties, or she would not be able to work tomorrow."  (Docket Nos. 65 at ¶ 63; 66-3 at 17).

The following day, July 8, after Plaintiff again informed Gayle that she needed to pump at 4:30 pm, Gayle "pulled [Plaintiff] into the office" and told her that unless she agreed to follow GAT's rules, she would be "suspended until further notice".  (Docket Nos. 65 at ¶ 68; 76 at 133-34).  Then Gayle sent Plaintiff home again.  (Docket Nos. 65 at ¶ 71; 76 at 134).  Thereafter,

---

[15] Plaintiff was permitted to start her break at 5:06 pm (36 minutes after her requested pumping time), but "wasn't able to pump due to someone being in the mothers lounge until" 5:24.  (Docket No. 66-3 at 3).

because Plaintiff would not relinquish her clamed right to pump in accordance with her physiological need, Defendants "wouldn't allow [her] to work".

On July 14, Gayle wrote Plaintiff up again, for leaving her post without authorization on July 7.  (Docket Nos. 65 at ¶ 65; 66-3 at 14).  The write-up falsely charged that Plaintiff was "refusing to work [her] schedule shifts unless [she] can walk away from [her] post whenever [she] would like."  (Docket Nos. 65 at ¶ 66; 66-3 at 14; 76 at 128-29).

From mid-July until early August of 2022, a representative of the DOL was in regular communication with Beaty concerning the DOL's investigation of Plaintiff's claim that GAT was violating the FLSA by failing to provide her with reasonable pumping accommodations.  (Docket No. 66-2 at 2-15).  On July 25, the DOL sent a letter informing Beaty of its position that Plaintiff "needs to be permitted to take a break *each time* she has the need to express milk, which she has advised is between 4:30-4:45pm and 7:30-7:45 pm" and that despite "inconvenience due to the timing of the scheduled flights", GAT "must come up with a solution in order to come into compliance with the Act."  (Docket No. 66-2 at 4).  The letter suggested that GAT may need to "provide coverage at [Plaintiff's] workstation to allow her to take her breaks", if it is not "possible to have her cover a flight from 5:30pm-7:15pm . . . [when] she does not need a break".  (*Id.*).  The letter concluded with a request to "advise of how the company intends to comply with Section 7(r) of the FLSA", and a warning that "[i]f they refuse to comply, I will notify management and further action may be pursued."  (*Id.*).

On August 10, Plaintiff received a text from Followell requesting that Plaintiff return her work badge until she was "ready to return to work" and could be reinstated.  (Docket Nos. 65 at ¶ 74; 66-3 at 30).  On or about August 17, 2022 GAT sent Plaintiff a Notice of Separation dated August 17 but reciting that Plaintiff's employment with GAT has been terminated for "job

11

abandonment" effective "today, **08/10/2022**."  (Docket Nos. 65 at ¶ 75; 66-3 at 34) (bold in original).[16]

### B. Procedural History

As noted in the Court's prior Memorandum Opinion, in mid-July 2022, Plaintiff filed complaints with the DOL and the EEOC.  She filed a supplemental Charge of Discrimination with the EEOC on approximately August 19, 2022 and received a Right to Sue notice on February 28, 2023.  Having exhausted her administrative remedies, Plaintiff filed her initial Complaint on May 5, 2023 and First Amended Complaint on October 30, 2023.  (Docket Nos. 1 and 10).  Defendants' Partial Motion to Dismiss was filed on November 20, 2023, and decided on February 20, 2024.  (Docket Nos. 11–12, 18, 20, 22 and 25).  The subsequent procedural history of the pending Motion for Summary Judgment is set forth in Section I, *supra*.

### III. APPLICABLE LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party,[17] the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(a) & (c)(1)(A).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[16] Plaintiff testified that she thinks "at first, . . . I was told I was fired for job abandonment, and then they told me I was fired for insubordination."  (Docket No. 76 at 137).  Plaintiff further testified that GAT was "lying" when it said that she abandoned her job.  (Docket No. 76 at 140).

[17] *See e.g.*, *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007) (noting that the court must interpret the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor).

322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates

the absence of a genuine issue of material fact; that is, the movant must show that the evidence of

record is insufficient to carry the non-movant's burden of proof.  *Id*.  Once that burden has been

met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for

trial*" or the factual record will be taken as presented by the moving party and judgment will be

entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp*., 475 U.S. 574,

587 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis added by *Matsushita* Court).

An issue is genuine only "if the evidence is such that a reasonable jury could return a

verdict for the non-moving party."  *Anderson v. Liberty-Lobby, Inc*., 477 U.S. 242, 248 (1986).  In

*Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the
> evidence and determine the truth of the matter but to determine whether there is a
> genuine issue for trial.  . . .  [T]here is no issue for trial unless there is sufficient
> evidence favoring the nonmoving party for a jury to return a verdict for that party.
> If the evidence is merely colorable, or is not significantly probative, summary
> judgment may be granted.

*Id*. at 249-50 (internal citations omitted).  *See also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir.

2005).[18]

## IV.    RELEVANT STATUTORY PROVISIONS

### A.  FLSA

The "Break Time for Nursing Mothers" provisions of the FLSA, as in effect at the time of

the events at issue herein, required employers to (a) provide "reasonable break time for an

employee to express breast milk for her nursing child for 1 year after the child's birth each time

such employee has need to express the milk," although the employer is not "required to compensate

---

[18] In summary, the inquiry under a Rule 56 motion is whether the evidence of record (a) presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution or (b) is so one-sided that the movant must prevail as a matter of law. It is on this standard that the Court has reviewed the pending motion.

an employee receiving [such] reasonable break time for any work time spent for such purpose"; and (b) provide "a place other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." 29 U.S.C. §§ 207(r)(1)(A)-(B) and (2).[19]

In its interpretive Notice concerning section 207(r), the DOL observed that (a) any such break time allowed, while not required to be compensated, must be counted as hours worked in determining compliance with minimum wage/overtime requirements and (b) using otherwise paid time to meet pumping needs may not convert it to unpaid time. *Reasonable Break Time for Nursing Mothers*, 75 Fed. Reg. 80073, *80074-75, 78 (Dec. 21, 2010).[20] The DOL further reaffirmed (in addition to the limited monetary remedies for an employer's violation of section 207(r)), the right of a nursing employee who (a) is "discharged or in any other manner discriminated against" because she has filed a complaint or instituted any proceeding regarding

---

[19] Section 207(r) was added to the FLSA effective March 2010. In April 2023, it was fully repealed and replaced by the broader nursing mothers' protection/enforcement provisions of the PUMP Act enacted the previous December. Effectively, the PUMP Act moved the FLSA's reasonable break provision from 29 U.S.C. § 209(r) to 29 U.S.C. § 218d. *See* discussion, *infra*, Sections VI (A) and (B).

[20] As detailed in the prior Memorandum Opinion:

The Notice also provides information intended to inform employers' provision of "reasonable break time", including that during its first six (6) months a baby requires feeding every two to three hours and milk "must be removed by a pump about as frequently as the baby usually nurses". The DOL thus expressly "expects that nursing mothers typically will need breaks to express milk two to three times during an eight-hour shift" and those breaks may or may not "track regular breaks and lunch periods." It also cautions that impeding a nursing mother's ability to express milk may (a) cause a drop in her milk supply which could render her unable to continue nursing and/or (b) an infection. With respect to a reasonable time frame, the DOL notes that the time necessary to express varies among nursing women (with 15 to 20 minutes typical), but that the proximity of the space(s) provided for pumping to the employee's work area, and the time needed for retrieving supplies, set up, efficiency of the pump, clean up and storage (all affected by the proximity of "amenities" such as a personal locker, sink, and refrigerator) should also be considered in the employer's determination – with the nursing mother - of "what will constitute 'a reasonable breaktime' and how to incorporate the breaks into the work period." In assessing the reasonableness of accommodation, "the Department will consider all the[se reasonably necessary] steps . . . ." [75 Fed. Reg.] at *80075.

(Docket No. 25 at 8-9).

her break rights, to file a private cause of action for retaliation, or (b) is treated differently than employees who take breaks for other personal reasons, to file a "claim for disparate treatment under Title VII". 75 Fed. Reg. 80073 (citing 29 U.S.C. §§ 215(a)(3), 216(b)).

The FLSA expressly prohibits retaliation against employees who exercise their rights under the Act, providing that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). *See also Dajti v. Penn Cmty. Bank*, CV 20-1483, 2021 WL 1209835, at *5 (E.D. Pa. Mar. 31, 2021) (holding that employee's oral complaints, expressions of concerns and attempts to address need for reasonable breaks with employer's HR department constituted protected activity within section 215(a)(3)).[21] Where an employer violates the provisions of section 215(a)(3), the applicable FLSA remedial provision creates liability "for such legal or equitable relief as may be appropriate to effectuate the purposes of [said sections], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

## B. Title VII

Title VII of the Civil Rights Act of 1964, as amended, outlaws sex discrimination as follows:

It shall be an unlawful employment practice for an employer . . .

---

[21] The *Dajti* Court soundly observed that in the related context of Title VII protected activity includes "oral and written complaints and protests, whether formal or informal, to discriminatory practices prohibited by the statute." *Id.* (quoting *Parker v. Philadelphia Newspapers, Inc*., 322 F. Supp. 2d 624, 630 (E.D. Pa. 2004) (citing *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 287-88 (3d Cir. 2001) *See also Kasten v. Saint–Gobain Performance Plastics Corp*., 563 U.S. 1, 14, 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011) (finding, in the context of the National Labor Relations Act, that oral complaints can constitute protected activity provided that the complaint is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection").

> to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).  In 1978 the Pregnancy Discrimination Act amended Title VII to clarify that:

> The term[] "because of sex" . . . include[s] . . . because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k).

> Finally, Title VII also outlaws retaliation for opposing discrimination:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

## V.    DISCUSSION

Defendants move to dismiss Plaintiff's remaining claims under the FLSA, Title VII and the PHRA.  The Court will grant dismissal of Plaintiff's claims at Count I, under 29 U.S.C. § 207(r), but will deny Defendants' motion in all other respects.  The Court's rationale follows.

### A.    FLSA Section 207(r) (Count I)

Count I asserts a claim for violation of 29 U.S.C. § 207(r), which at all relevant times[22] required employers to provide "reasonable break time", and an appropriate private place, for a nursing mother to express breast milk.  (Docket No. 10 at ¶¶ 177-84).  Defendants contend that

---

[22] Section 207(r) was in effect from March, 2010 until April, 2023, when it was repealed and subsumed within the present 29 U.S.C. § 218d.  *See* n.1, *supra*.

they are entitled to dismissal of this Count because (i) GAT's proffered accommodations were indisputably reasonable; and (ii) Plaintiff sustained no injury compensable under Section 207(r). (Docket No. 64 at 7-10).

As to Defendants' first ground, the Court wholly rejects their conclusion that "based on the undisputed record evidence, Plaintiff cannot establish, as a matter of law, that GAT violated Section 207(r)" – finding it to be predicated on a presentation of the record that omits material facts and reasonable inferences favorable to Plaintiff, and construes included facts and inferences in an unfavorable light.  (Docket No. 64 at 9).[23]  In short, the Court finds that a jury could reasonably determine that GAT did not meaningfully attempt to meet Plaintiff's physiological pumping requirements, and that its offers of breaks at different times than needed did not satisfy the dictates of Section 207(r).

It is unnecessary for the Court to address the foregoing ground in greater detail, however, because the Court finds that Defendants' second ground is well-taken, and that Defendants are entitled to a judgment dismissing Count I due to Plaintiff's failure to establish a compensable injury.  Damages for violation of Section 207(r) appear to be limited by statute to "unpaid minimum wages, . . . unpaid overtime compensation, . . . and . . . an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  In its opinion denying Defendants' motion to dismiss as to Count I, the Court noted that the effect of GAT's break policies on minimum wage compliance was "not yet clear".  (Docket No. 25 at 14, n.12).  Now, at the summary judgment stage, the matter has become clear, as Plaintiff expressly agreed with Defendants' statement that

---

[23] In contrast, the Court accepts Plaintiff's counter-presentation as thorough, appropriately grounded, and persuasive. (Docket No. 74 at 7-10).  In particular, the Court agrees with Plaintiff's grounds for distinguishing *Walls v. Abington Surgical Ctr.*, 758 F. Supp. 3d 376 (E.D. Pa. 2024), which, as Plaintiff notes, "GAT heavily relies upon".  (Docket No. 74 at 8 n.1).

"[a]t all times, Plaintiff was paid more than minimum wage for each shift she worked – even taking into account unpaid breaks."  (Docket Nos. 65 at ¶ 39; 75 at ¶ 39).[24]

The Court also observed in its prior opinion that some of its sister courts have found that requiring an employee to use paid leave time in order to pump gives rise to a cognizable injury under section 207(r), and that the FAC may be read to allege that "Plaintiff was being required to pump during scheduled breaks to which she was otherwise entitled."  (Docket No. 25 at 13-14). However, Plaintiff (who has the burden of proof as to damages) has not proffered evidence to support a claim that she was required to expend accrued leave or other financial assets in order to pump – electing instead to leave unrefuted Defendants' assertion that "she was not required to take leave to pump."  (Docket No. 64 at 10).  Indeed, Plaintiff's sole response to Defendants' second ground for dismissal of Count I is to rely upon this Court's prior decision:

> [T]his Court already rejected Defendants' "no injury" theory at the motion to dismiss stage.
> . . . .
> As this Court held when denying Defendants' motion to dismiss . . . , the fact that Plaintiff may not have a hefty wage loss "does not in itself entitle defendants to dismissal" of a §207(r) claim.

(Docket No. 74 at 8).  Plaintiff's argument misstates the Court's holding: it is "the DOL's indication there would be no recovery *in most cases*" – not the absence of a "hefty wage loss" – that "does not in itself entitle defendants to dismissal".  (Docket No. 25 at 16) (italics in original). The statement misattributed to the Court is undoubtedly true (as unpaid wages need not be "hefty" to be recoverable); but to the extent it is proffered as a ground for disregarding the absence of *any* financial loss, it is inapposite.  Here, so far as the record shows, Plaintiff has not sustained any

---

[24] Although the parties do not explicitly address overtime, it may reasonably be inferred from Plaintiff's work schedule of two seven-hour shifts per week that she did not incur any unpaid overtime.  *Cf.* 29 U.S.C. § 207(a)(1) (requiring overtime compensation "for a workweek longer than forty hours").  In any event, Plaintiff does not appear to assert any claim for unpaid overtime.

financial loss which could be characterized as unpaid minimum wage or overtime.  Accordingly, Defendants are entitled to a judgment dismissing Count I with prejudice.

### B.    Retaliation Under FLSA (Count II), Title VII (Count VII) and PHRA (Count XI)

In Count II, Plaintiff asserts a claim against GAT for violation of the FLSA's general prohibitions against retaliation, as set forth in section 215(a)(3).  (Docket No. 10 at ¶¶185–91).  In Counts VII and XI, Plaintiff asserts similar claims for retaliation under Title VII and the PHRA, respectively.[25]  (Docket No. 10 at ¶¶ 238-54, 286-89).  Such claims are analyzed under "the familiar burden-shifting framework articulated in *McDonnell Douglas*." *Cononie v. Allegheny Gen. Hosp.*, 29 F. App'x 94, 95 (3d Cir. 2002).  Accordingly, "'[t]o state a prima facie case of retaliatory discrimination under the FLSA, a plaintiff must plead that (1) the plaintiff engaged in protected activity, (2) the employer took an adverse employment action against [her], and (3) there was a causal link between the plaintiff's protected action and employer's adverse action.'" *Szewczyk v. United Parcel Serv., Inc*., No. 19-1109, 2019 WL 5423036, at *6 (E.D. Pa. Oct. 22, 2019) (quoting *Bedolla v. Brandolini*, No. 18-146, 2018 WL 2291117, at *3 (E.D. Pa. May 18, 2018)).  *See also Berrada v. Cohen*, 792 F. App'x 158, 164 (3d Cir. 2019) (citing *Darveau v. Detecon*, 515 F.3d 334, 340 (4th Cir. 2008)).  The elements under Title VII (and hence also under the PHRA) are substantially the same:

> To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."

---

[25] Plaintiff's Title VII and parallel PHRA claims are analyzed together.  *See Dajti,* 2021 WL 1209835, at *3*; Woodson v. Scott Paper Co*., 109 F.3d 913, 919-20 (3d Cir. 1997); *see also Keita v. Delta Cmty. Supports, Inc*., Civ. A. No 19-5967, 2020 WL 6528749, at *2 (E.D. Pa. Nov. 5, 2020) ("The relevant provisions of each statute have 'nearly identical language,' and require the same elements to establish a prima facie claim." (quoting *Driscoll v. Lincoln Tech. Inst*., 702 F. Supp. 2d 542, 545-46 (E.D. Pa. 2010)).

*Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006), quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995).[26]

Here, the record establishes that Plaintiff engaged in protected activity under the FLSA and Title VII by complaining to supervisory and HR personnel about denial or restriction of her right to pump, and by filing complaints thereon with the DOL and the EEOC. Moreover, the record clearly shows that GAT took adverse employment actions against Plaintiff by disciplining her, suspending her, and ultimately terminating her employment. As Plaintiffs observe, the first two *prima facie* elements are not seriously disputed, and so "[t]he core issue for retaliation is whether a jury could find a causal connection between Plaintiff's . . . complaints and these adverse actions." (Docket No. 74 at 11).[27]

Third Circuit "case law has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Patterson C. of N.J.*, 260 F.3d 265, ____ (3d Cir. 2001), citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).[28] *See also Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997) ("[T]emporal proximity . . . is sufficient to establish the causal link . . . . [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer

---

[26] *Prima facie* claims of retaliation under Title VII require a slightly different second element. Under Title VII, the plaintiff need not prove an ultimate adverse employment action, because the scope of Title VII's provision extends beyond employment-related retaliatory acts. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Rather, the plaintiff only needs to prove a "materially adverse" action, one which "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.* at 68, 126 S.Ct. 2405 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The first and third elements are the same. *See Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008).

[27] *Cf. Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015) ("Thus, as is often true in retaliation cases, this case turns on whether the plaintiff . . . can establish that there was a causal connection between her protected activities and [the employer's] adverse actions.").

[28] Notwithstanding their primacy in the case law, these factors are not exclusive. As the *Farrell* court observed, "[a]lthough timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell*, 206 F.3d at 280-81.

engaged in a pattern of antagonism in the intervening period.").  As to the first factor, Plaintiff

asserts that "[t]he timeline alone raises a strong inference of causation", noting that "within a

matter of days" after asserting her rights and contacting the DOL she was "subjected to escalating

punishment", and then she was fired within about six weeks.  (Docket No. 74 at 11-12).  *See*

*Daniels*, 776 F.3d at 196 ("To demonstrate a link between protected activity and an employer's

adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually

suggestive.'") (quoting *Farrell*, 206 F.3d at 284).[29]

      As to the second factor, the Court notes that evidence of dismissive, hostile and obstructive

comments from supervisory personnel, and mischaracterization of Plaintiff's absences, provide

additional support for an inference of retaliatory intent.[30]  As the Third Circuit has explained, "[i]n

the absence of such a close temporal proximity, we consider the circumstances as a whole,

including any intervening antagonism by the employer, inconsistencies in the reasons the employer

gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory

animus when taking the adverse action."  *Daniels*, 776 F.3d at 196.

      Defendants argue that Plaintiff's retaliation claims "fail because there is nothing in [the]

record showing that she was retaliated against *because* she expressed a need to breastfeed or filed a

complaint with the Department of Labor."  (Docket No. 64 at 18) (italics in original).  However, the

---

[29] The timeline is perhaps even more suggestive than what is set forth in Plaintiff's brief: although six weeks passed
between Plaintiff informing Defendants of her intent to file a complaint with the DOL and her termination, that
termination occurred just 16 days after the DOL notified GAT that it would have to change its staffing or scheduling
policies to accommodate Plaintiff's right to pump when physiologically necessary.

[30] *Cf. Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812, 819 (E.D. Pa. 2009) (noting that Third Circuit has held
that "a plaintiff may demonstrate that the decision to terminate her was likely motivated by discriminatory animus
where 'those exhibiting discriminatory animus influenced or participated in the decision to terminate'") (quoting
*Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 285-86 (3d Cir. 2001)).

Court finds that Plaintiff has adequately supported a *prima facie* case of retaliation, based upon a combination of suggestive timing and ongoing, escalating antagonism.[31]

"Under the *McDonnell Douglas* burden-shifting framework, after a plaintiff makes out a *prima facie* case, the burden of production shifts to the employer to provide a legitimate, non-retaliatory reason for its action against the plaintiff, and then the plaintiff may prevail at summary judgment only if [she] has evidence that the employer's response is merely a pretext." *Kengerski v. Harper*, 6 F.4th 531, 536 n.3 (3d Cir. 2021), citing *Moore*, 461 F.3d at 342.[32] The Court finds that Defendants have articulated non-retaliatory reasons, by attributing Plaintiff's discipline to her own misconduct in leaving her assigned post without approval and in refusing to return to work "unless GAT permitted her to leave her gate whenever she needed to express milk". (*Id.*).[33] However, the Court further finds

---

[31] Defendants also contend that GAT's continued efforts to accommodate Plaintiff's pumping needs contradict any assertion of retaliatory animus. (Docket No. 64 at 18). However, construing the record in the light most favorable to Plaintiff, a jury could reasonably find that GAT's persistence in offering pumping breaks with times or durations that did not meet Plaintiff's physiological needs does not belie a pattern of antagonism shown by its supervisory personnel and its disciplinary actions.

[32] In their reply brief, Defendants assert that "[t]o establish pretext, Plaintiff must show '*both* that the reason was false, *and* that discrimination was the real reason.'" Docket No. 77 at 10, quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d. Cir. 1994) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis in original). Although Defendants' quotation is accurate, this Court notes that just two paragraphs later the *Fuentes* court restated the rule as:

> [A] plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Fuentes*, 32 F.3d at 764 (emphasis in original). Moreover, in *Torre v. Casio, Inc.*, 42 F.3d 825 (3d Cir. 1994), the Third Circuit explicitly rejected a lower court's holding that "[i]n the context of a motion for summary judgment, plaintiff must produce sufficient evidence from which a rational factfinder could conclude that [the employer's] reasons are unworthy of credence *and* that the real motivation behind the transfer and/or termination was discrimination", holding instead that under *Fuentes*, "at summary judgment a plaintiff need only present evidence from which a reasonable factfinder could conclude *either* that the defendant's proffered justifications are not worthy of credence *or* that the real reason for the decision was discrimination." *Torre*, 42 F.3d at 832 (emphasis in original).

[33] It is unclear whether Defendants' argument is intended to negate the causal link element of Plaintiff's *prima facie* case in the initial phase of a *McDonnell Douglas* analysis, or to establish Defendant's non-retaliatory reason in the second phase, or both. As the Third Circuit recognized in *Farrell*, the risk of "conflat[ing] the test for causation under the *prima facie* case with that for pretext" is perhaps "inherent in the nature of the two questions being asked — which are quite similar." *Farrell*, 206 F.3d at 286. The court further observed that "evidence supporting the *prima facie* case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Id.*

that Plaintiff has adduced evidence from which a jury could reasonably determine that Defendants' proffered reasons are pretextual – including, as discussed above, evidence of suggestive timing and ongoing, escalating antagonism.[34]  All of the incidents for which discipline was imposed centered on the parties' disagreements with respect to Plaintiff's right to a reasonable opportunity to express breastmilk in accordance with her physiological need.  Because Defendants never deviated from their position that Plaintiff's physiological needs must yield to GAT's scheduling constraints, a jury could reasonably conclude that GAT had no intention of complying with section 207(r), and that its disciplinary actions were motivated by a desire to rid itself of an employee who would not quietly accede to a curtailment of her FLSA rights.[35]

### C.    Discrimination Under Title VII (Count V) and PHRA (Count X)

Counts V and X of the First Amended Complaint allege, respectively, that GAT violated Title VII and parallel state law under the PHRA by discriminating against her on the basis of her pregnancy by failing to provide meaningful accommodation for expressing milk during the workday, impeding her from meeting her lactation needs, and subjecting her to adverse employment actions for pretextual reasons.  (Docket No. 10 ¶¶ 203–15; 275–85).

It is well established that Title VII prohibits employment discrimination (as well as a hostile work environment) because of or based on an employee's sex.  *Anderson v. Boeing Co.*, 694 F. App'x 84, 86 n.3 (3d Cir. 2017) (citing 42 U.S.C. § 2000e–2(a)).  And the PDA amended

---

[34] A jury could also find that that Defendants mischaracterized Plaintiff's demands and the voluntariness of her absences, which would amount to "inconsistencies in the reasons the employer gives for its adverse action" within the contemplation of *Farrell*, *supra.*

[35] The Court notes that Plaintiff's expectations and requests for breaks to pump (a) at times proximate to her new baby's nursing schedule and (b) for lengths of time that reasonably reflected the distance to GAT's allowed location and available supportive facilities (locker, sink, refrigeration) were in accord with the DOL's own expectations of "reasonable" nursing employee accommodations - *i.e.*, that pumping breaks might or might not "track" regular shift breaks and that employers should include all necessary "steps" in the calculation of break time.  *See* Section V(A); *Reasonable Break Time for Nursing Mothers*, 75 Fed. Reg. 80073 (Dec. 21, 2010).  The constraints allegedly imposed, and denials made, by GAT were not in accord with the DOL's guidance.

Title VII to make clear that its "prohibition against sex discrimination applies to discrimination based on pregnancy" and that "employers must treat 'women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.'" *Young v. United Parcel Serv., Inc.,* 525 U.S. 206, 135 S. Ct. 1338, 1343 (2015) (citing 42 U.S.C. § 2000e(k)).[36]

Because Plaintiff has not submitted direct evidence of discrimination, Plaintiff's discrimination claims are subject to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Young*, 135 S. Ct. at 1345 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)). "Under that familiar test, the plaintiff must first establish a prima facie case of discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205 , 214 (3d Cir. 2008).[37]  Here, the first three elements are clearly met, as the record (read in the light most favorable to Plaintiff) shows that (1) as a mother nursing a new baby, Plaintiff is a "woman affected by pregnancy", and hence a member of a protected class under Title VII (as amended by the PDA);

---

[36] Despite Defendants' sweeping statement that "delayed pumping breaks cannot form the basis of a discrimination claim" (Docket No. 77 at 4), as our sister Court for the Eastern District of Pennsylvania noted in *Dajti*:

> 'While the Third Circuit has not expressly resolved whether 'a complaint based [solely] on the need to express breast milk is cognizable under Title VII,' other courts have so held.' *Mercado v. Sugarhouse HSP Gaming, L.P*., Civ A. No. 18-3641, 2019 WL 3318355, at *5 (E.D. Pa. July 23, 2019) (alteration in original) (citing *Page v. Trustees of Univ. of Pa*., 222 F. App'x 144, 145 (3d Cir. 2007), *E.E.O.C. v. Houston Funding II, Ltd*., 717 F.3d 425, 428 (5th Cir. 2013); *Hicks v. City of Tuscaloosa, Alabama*, 870 F.3d 1253, 1259 (11th Cir. 2017)).

*Dajti*, 2021 WL 1209835, at *3.

[37] In cases predicating discrimination on a latent condition (such as pregnancy or lactation), the employer's knowledge of that condition is an additional "critical element of the plaintiff's prima facie case." *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).  Here, the record is replete with evidence that Plaintiff informed and continually reminded her supervisors of her status as a nursing mother and her consequent need to express breastmilk on a regular schedule.

(2) Plaintiff was objectively qualified for her position as a CSA;[38] and (3) Plaintiff was written up, suspended and terminated, which constitute adverse employment actions.   As to the fourth element, while a number of Third Circuit cases have "described [that] element as requiring the plaintiff to prove that he or she was 'ultimately replaced by a person sufficiently outside the protected class to create an inference of discrimination'", the Circuit has concluded that such language is inconsistent with Circuit and Supreme Court case law, is "simply not precise", and is "particularly inappropriate in the . . . context [of] gender discrimination".   *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 356-57 (3d Cir. 1999).   The Court observed that it has "repeatedly emphasized that the requirements of the prima facie case are flexible, and in particular that 'the fourth element must be relaxed in certain circumstances'".   *Id.* at 357, quoting *Torre*, 42 F.3d at 831.[39]   Hence, in *Pivirotto* the Court expressly agreed with a First Circuit holding that "a complainant can satisfy the fourth prong of her prima [facie] case simply by showing that, as here, the employer had a continued need for 'someone to perform the same work after the complainant left.'"   *Pivirotto*, 191 F.3d at 354, quoting *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 155

---

[38] The *prima facie* inquiry is solely concerned with **objective** job qualifications "such as, say, educational requirements", as opposed to an employer's subjective expectations.  *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997).

[39] Although the *Torre* opinion applied a relaxed fourth element in the context of a reduction in force, in *Pivirotto* the Court explained that "we have never held that the fourth element of the prima facie case should be relaxed only when there is a reduction in force. Rather, this has simply been the most frequent and the most obvious occasion for modifying the typical requirements of the prima facie case."  This Court notes that in the reduction in force context, cases have found the fourth element satisfied upon a showing that employees outside of the plaintiff's protected class were not terminated.  *See Torre*, 42 F.3d at 831-32 ("[Y]ounger people were not transferred when Torre was transferred, and younger people subsumed his duties.  Furthermore, younger people were retained when Torre was terminated. These facts suffice to complete Torre's prima facie case . . . ."); *Marzano v. Computer Science Corp.*, 91 F.3d 497, 503 (3d Cir. 1996) ("it is sufficient to show that he was discharged, while the [employer] retained someone [outside the protected class]") (brackets in original; citations omitted).  *Cf. Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 (3d Cir. 1983) ("This prima facie case is easily made out: a plaintiff alleging a discriminatory layoff need show only that he is a member of the protected class and that he was laid off from a job for which he was qualified while others not in the protected class were treated more favorably.").

(1st Cir. 1990).  This test is plainly met in this case.[40]  Accordingly the Court holds that Plaintiff has satisfied her *prima facie* burden with respect to discriminatory discipline and discharge.

From here, the analysis of Plaintiff's discrimination claim closely parallels that of her retaliation claim: Defendants have proffered non-discriminatory reasons for Plaintiff's discipline and discharge, but Plaintiff's evidence suffices to create a triable issue as to whether those proffered reasons constitute a pretext for discrimination based on Plaintiff's need to pump breastmilk (which, under the PDA as interpreted in *Young*, would amount to discrimination based on sex, in violation of Title VII).  *See* Section V(B), *supra*.  Consequently, Defendants are not entitled to summary judgment on Plaintiff's discriminatory discipline and termination claims.[41]

In addition to her claim for discriminatory discipline and termination, Plaintiff has asserted a claim for discriminatory denial of accommodation.  A plaintiff may state a *prima facie* case that the denial of an accommodation constituted disparate treatment under Title VII or the PHRA by alleging and supporting the following four factors: (1) "that [the plaintiff] belongs to the protected class," (2) "that she sought accommodation," (3) "that the employer did not accommodate her," and (4) "that the employer did accommodate others 'similar in their ability or inability to work.' " *Id.* at 1354.

Here, the record (read in the light most favorable to Plaintiff) shows that (1) as above, Plaintiff is a member of a protected class of women affected by pregnancy; (2) Plaintiff repeatedly sought reasonable nursing employee accommodations, including the allowance of medically

---

[40] *See* Docket No. 76 at 336 (Gayle's testimony that Plaintiff was "kept on the schedule as long as she follows the policy and comes to work and works her shift.  So when she gets to the point where . . . I can't count on this individual, . . . obviously I'm going to schedule other individuals to ensure the operation is taken care of.").

[41] As the Third Circuit has observed, "[e]mployment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this is clearly a factual question, summary judgment is in fact rarely appropriate in this type of case."  *Marzano*, 91 F.3d at 509 (internal quotation marks and citation omitted).

necessary breaks to express milk on approximately the same 3-hour schedule as her baby's nursing; (3) GAT denied the requested accommodations, required instead that she conform her pumping to otherwise scheduled break times, and declined to "shuffle around" other employees to cover for Plaintiff if she needed a pumping break during operational times; and (4) GAT routinely shuffled employees to cover for other employees who needed to be away from their posts during operations for reasons other than to pump breastmilk. (Docket No. 65 at ¶¶ 25, 33-34, 43, 48-50, 55; No. 75 at ¶¶ 43, 49, 52, 56, 62, 73, 78, 83).[42] Based on the foregoing evidence, the Court finds that Plaintiff has met her *prima facie* burden.[43] *See Dajti*, 2021 WL 1209835, at *3–4 (declining to dismiss Title VII and PHRA discrimination claims where nursing employee adequately stated claim under *Young*).

---

[42] In their reply brief, Defendants contend that Followell's testimony about shuffling employees around "describes assigning employees before a shift based on operational needs, such as when a flight was expected to be full"; and that "[t]here is no evidence that, in the middle of flight operations, GAT could re-assign an employee to another post across the airport the minute that Plaintiff – or any other employee – needed to take a break." (Docket No. 77 at 7 n.5). Edited for clarity, the testimony in question is as follows:

> Q. . . . . Were there ever situations where someone from one area . . . would have to leave . . . and help out at [another area] . . . [where they] weren't scheduled to work . . . ?
>
> . . . .
>
> Q. [In other words,] . . . were there ever situations where . . . you needed more people who weren't currently assigned [to an area]? . . . [W]here someone came over from another assignment to assist . . . ?
>
> A. . . . . If we had to pull one person from another location to work operationally there are adjustments that do need to be made on a continual basis based on a multitude of factors.
>
> Q. So it does happen where people sort of get shuffled around depending on need?
>
> A. Routinely.

(Docket No. 76 at 422-23). Nothing in this passage limits the "continual" adjustment of "routine" shuffling to pre-shift assignments. Rather, read in the light most favorable to Plaintiff, the testimony refers to moving employees from their assigned post based on needs arising during a shift. Moreover, notwithstanding Defendants' hyperbole, the accommodations Plaintiff requested did not require re-assignment of other employees "the minute that Plaintiff . . . needed to take a break." Rather, the record shows that Defendants were well aware of Plaintiff's asserted need to pump at approximately the same time – between 4:30 and 4:45 p.m. – during every shift. *See* Section II(A), *supra*.

[43] Defendants argue that the record "precludes an inference of discrimination because Plaintiff was treated more favorably than her peers" by being provided preferential shifts and posts and extended breaks. (Docket No. 64 at 13). However, a jury could reasonably find that these accommodations were unavailing, and that Plaintiff was actually treated less favorably than fellow employees because Defendants disciplined her rather than shuffling employees to cover for her when she needed to leave her post.

Defendants have not proffered any non-discriminatory reason (or indeed any reason) for GAT's alleged differential provision of on-shift coverage for nursing versus non-nursing employees.[44]  Since Defendants have not met their burden of production under the *McDonnell Douglas* framework, the question of pretext does not arise at this stage, and Defendants are not entitled to summary judgment on Plaintiff's discriminatory accommodation claim.

### D.    Hostile Work Environment Under Title VII (Count VI)

Count VI of the FAC claims that GAT subjected Plaintiff to a hostile work environment in violation of Title VII.  (Docket No. 10 ¶¶ 216–37).[45]  "Reduced to its most basic components, an actionable hostile work environment requires proof that Plaintiff was subjected to a level of gender or race-based harassment which was 'severe or pervasive' enough to create a working environment which is both subjectively and objectively abusive or hostile to female . . . employees." *McCowan*, 2021 WL 84013, at *24 (quoting *Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 411 (D.N.J. May 12, 2003)) (additional citations omitted); *see also Chinery v. Am. Airlines*, 778 F. App'x 142, 145 (3d Cir. 2019) (citing *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 167 (3d Cir. 2013)). In determining whether harassment rises to the level of an actionable hostile work environment, courts consider the "totality of the circumstances . . . including the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive

---

[44] *Cf. Young*, 135 S. Ct. at 1354 (When a plaintiff has made out her *prima facie* case, "[t]he employer may then seek to justify its refusal to accommodate the plaintiff by relying on 'legitimate, nondiscriminatory' reasons for denying her accommodation.  But, consistent with the [PDA's] basic objective, that reason normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those . . . whom the employer accommodates.") (citation omitted).

[45] As previously addressed by this Court, hostile work environment and disparate treatment claims are distinct from one another and are based on different legal theories and, as such, they may be maintained and each subject to consideration of the evidence in support of their different proofs. (Docket No. 25) (citing *Rospendowski v. Columbia Cty. Sheriff*, No. 4:16-CV-00526, 2020 WL 5602967, at *3 (M.D. Pa. Sept. 18, 2020); *Achebe v. Bloomsburg Univ. of Pennsylvania*, No. 4:18-CV-01188, 2021 WL 3511138, at *3 (M.D. Pa. Aug. 10, 2021); Fed. R. Civ. P. 8(d)-(f)). *See also Mayer*, 21 F.Supp.3d at 417-19 (holding that nursing employee stated claims under Title VII for both hostile work environment and discrimination in the form of discharge).

utterance, and whether it reasonably interfere[d] with an employee's work performance." *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 577 (E.D. Pa. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). *See also* Docket No. 18 at 10-11 (noting that severity and pervasiveness "are alternative possibilities" with the latter potentially met by "less objectionable" conduct) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017)).

Here, as detailed in Section II, *supra*, Plaintiff has adduced evidence that she experienced immediate, continuing and escalating hostile working conditions from the time she returned to work while nursing. Plaintiff attests, for example, that she was discouraged from continuing to work while nursing, her physiological and medical needs were treated dismissively and impeded, she was demeaningly and distressingly forced to delay her need to pump to conform to GAT's shift/break schedules and to pump when she did not need to, she was repeatedly rebuffed and derided for attempting to obtain legally-required accommodations to meet her reasonable lactation needs, and she was falsely and hostilely accused of neglecting her job duties, refusing offered return to the work schedule, and (ultimately) of abandoning her job. (Docket No. 74 at 15-16).[46] A jury could reasonably find that Defendants' conduct was not merely offensive, but was deeply humiliating and posed a threat to Plaintiff's health (and her baby's well-being); and that it reasonably interfered with Plaintiff's work performance. *Cf. Harris*, *supra*.[47]

---

[46] *Cf. Cuff v. Dept. of Corrections*, 2025 WL 1442706, *4 (3d Cir. 2025) ("[E]ven a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment. This remains true even where, as here, the information is self-serving.") (internal quotation marks and footnote omitted).

[47] The Court further observes that the standard of severe or pervasive conduct is appropriately considered in its temporal context. Here, Plaintiff's claim relates to conduct occurring during the very brief window of reduced part-time employment between her return from maternity leave at the end of May and her suspension for failure to comply with company policy and scheduled breaks on July 8, 2022. The incidents alleged in this time frame are sufficient to support Plaintiff's hostile work environment claim. *See Mayer*, 211 F.Supp.3d at 419–20 (declining to find as a matter of law that conduct alleged was not severe or pervasive given plaintiff's "very short tenure"); *Cuff*, 2025 WL 1442706 at *6 (finding sufficient evidence of pervasiveness "[g]iven that all events at issue appear to have occurred within a five-and-a-half month period," so that the plaintiff "was apparently encountering harassment at least once every other week on average").

Defendants argue that Plaintiff "cannot establish that failing to permit her to take breaks whenever she wanted was 'severe or pervasive' conduct", as "she was permitted to pump every shift, and generally within the three-hour timeframe she demanded."  (Docket No. 64 at 16-17). This argument ignores the numerous occasions when Plaintiff was *not* permitted to pump within the medically-required timeframe, and fails to address the substantial evidence of antagonism summarized above; and the Court finds it unpersuasive.  Accordingly, the Court finds that Plaintiff has sufficiently supported a claim for hostile work environment under Title VII.  *See Lampkins v. Mitra QSR, LLC*, No. 16-647-CFC, 2018 WL 6188779, at *5 (D. Del. Nov. 28, 2018)  (denying summary judgment where allegations included supervisor's discouragement and complaints, denials of needed pumping breaks and negative health/nursing consequences).[48]

### E.    Aiding and Abetting Under PHRA (Count XII)

Count XII of the FAC claims that Individual Defendants Gayle, Followell, and Beaty, each had supervisory authority over her, and each aided and abetted discrimination in violation of the PHRA.  (Docket No. 10 ¶¶ 290–92).[49]  *Cf. Clinkscales v. Children's Hosp. of Phila.*, No. 06-3919, 2007 WL 3355604, at *8 (E.D. Pa. Nov. 9, 2007) ("[T]he Third Circuit has distinguished between

---

[48] Although additional allegations in *Lampkins* were more egregious, the *Lampkins* Court identified the analogous conditions as factors in its holdings that plaintiff had not only stated a plausible claim but had evidenced material questions of fact.  *Id.* (observing that (a) it was "undisputed that Lampkins' supervisor discouraged her from pumping at work" and (b) her ability to nurse her baby was adversely affected because she was "not permitted to pump" as needed); *id.* (concluding that "[i]n light of the totality of these circumstances, which [employer] concedes were discriminatory, a reasonable jury could conclude that Lampkins faced severe or pervasive harassment that would detrimentally affect an objectively reasonable person").  *Cf. id.* (also denying summary judgment on claim for Title VII discrimination in form of constructive discharge).

[49] The PHRA prohibits "any person" from:

> aid[ing], abet[ting], incit[ing], or coerc[ing] the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be unlawful discriminatory practice.

43 Pa. C.S. § 955(e).

coworkers, who cannot be held liable under section 955(e), and supervisors, who can be held liable under that section.").

Defendants assert entitlement to dismissal of Plaintiff's aiding and abetting claims on the "threshold" ground that "there was no underlying violation of the PHRA." (Docket No. 64 at 19). However, in denying Defendant's pending motion for summary judgment with respect to Counts X and XI, this Court has determined that Plaintiff has duly supported triable claims for discrimination and retaliation in violation of the PHRA.

Defendants also argue that "there is no evidence that [the Individual Defendants] treated Plaintiff differently because of her status as a nursing mother, [or] that they harbored discriminatory or retaliatory animus against her", and that "[r]ather, the undisputed record shows that [they] tried to reason with Plaintiff to accommodate her pumping schedule, but she refused." (*Id.*). However, the record contains substantial evidence that each Individual Defendant substantially participated, in a supervisory capacity, in a pattern of conduct toward Plaintiff that, as discussed above, may fairly be found to constitute unlawful discrimination and retaliation. (Docket No. 65 at ¶¶ 3-5, 41, 47-49, 52-66, 69, 74; No. 75 at ¶¶ 49, 78, 84). *See generally* Section II(A), *supra*; *see also* Docket No. 74 at 19-20. Accordingly, the Court concludes that Plaintiff has adequately supported her claim for aiding and abetting liability under the PHRA against each of the Individual Defendants. *See McCowan,* 2021 WL 84013, *15-16; *id.* at 33; *Ahern v. Eresearch Tech., Inc.*, Civ. A. No. 15-5911, 183 F.Supp.3d 663, 669 (E.D. Pa. 2016) (individual liability for aiding and abetting may be "imposed for a supervisor's own discriminatory conduct or their failure to take action against discrimination experienced by the employee"); *Clinkscales*, 2007 WL 3355604, at *8 (denying motion to dismiss on aiding and abetting claim where the plaintiff's "allegations, when read generously, assert that [individual defendants], as human resources

officials, had the authority to stop the discriminatory conduct but failed to do so, thus aiding and abetting the discrimination in violation of section 955(e)").

## VI.    CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (Docket No. 63) is granted as to Plaintiff's Count I claim under 29 U.S.C. § 207(r) and denied in all other respects. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated:  September 15, 2025

cc/ecf:  All counsel of record